STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. VICTOR R. FUNICELLO, DEFENDANT-APPELLANT.

STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. MARVIN R. MATHIS, DEFENDANT-APPELLANT.

STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. EUTHER PRESHA AND PHILIP MARTIN RIVERS, DEFENDANTS-APPELLANTS.

STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. WALTER LEE WHITE, DEFENDANT-APPELLANT.

STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. THOMAS TRANTINO, DEFENDANT-APPELLANT.

STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. DANIEL ARTIS, DEFENDANT-APPELLANT.

STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. JESSE EDWARD WILSON, DEFENDANT-APPELLANT.

STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. WILBERT SINCLAIR, DEFENDANT-APPELLANT.

STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. ROBERT T. CONKLIN, DEFENDANT-APPELLANT.

STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. DANIEL C. KREMENS, DEFENDANT-APPELLANT.

STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. FREDERICK BENJAMIN THOMPSON, DEFENDANT-APPELLANT.

Argued December 20, 1971—Decided January 17, 1972.

62

*Mr. Stanley C. Van Ness,* Public Defender of New Jersey, argued the cause for appellant Funicello (*Mr. Gerald T. Foley, Jr.,* Deputy Public Defender; *Mr. Richard Newman; Mr. Jack Greenberg, Mr. Jack Himmelstein, Ms. Elaine R. Jones,* and *Ms. Mary Lynn Walker,* of the New York bar; *Mr. Anthony G. Amsterdam,* of the District of Columbia bar, on the brief).

*Mr. David S. Baime,* Assistant Prosecutor, argued the cause for respondent in *State v. Funicello (Mr. David Noah Dubrow,* Assistant Prosecutor, of counsel and on the brief (*Mr. Joseph P. Lordi,* Essex County Prosecutor, attorney).

*Mr. Barry H. Evenchick,* Deputy Attorney General, argued the cause for Attorney General of New Jersey, *amicus curiae* (*Mr. John A. Brogan,* Deputy Attorney General, of counsel and on the brief; *Mr. George F. Kugler, Jr.,* Attorney General).

*Mr. Herbert I. Waldman,* Assistant Deputy Public Defender, appeared on behalf of appellant Mathis (*Mr. Waldman,* on the brief; *Mr. Stanley C. Van Ness,* Public Defender, attorney).

*Mr. Michael J. Mitzner,* Assistant Prosecutor, appeared on behalf of respondent in *State v. Mathis (Mr. Elson P. Kendall,* Assistant Prosecutor, on the brief; *Mr. Karl Asch,* Union County Prosecutor, attorney).

*Mr. Michael B. Blacker* argued the cause for appellant Rivers; *Mr. William P. Ries* appeared on behalf of appellant Presha (*Mr. Stanley C. Van Ness,* Public Defender, attorney).

*Mr. Michael J. Mitzner,* Assistant Prosecutor, argued the cause for respondent in *State v. Rivers (Mr. Elson P. Kendall,* Assistant Prosecutor, on the brief; *Mr. Karl Asch,* Union County Prosecutor, attorney).

*Mr. William P. Ries* argued the cause for appellant White (*Mr. Stanley C. Van Ness,* Public Defender, attorney).

*Mr. David S. Baime,* Assistant Prosecutor, argued the cause for respondent in *State v. White (Mr. Joseph P. Lordi,* Essex County Prosecutor, attorney).

*Mr. Jeffrey E. Fogel* argued the cause on behalf of appellant Trantino.

*Mr. David G. Lucas,* Deputy Attorney General, appeared on behalf of respondent in *State v. Trantino* (*Mr. George F. Kugler, Jr.,* Attorney General, attorney).

*Mr. I. Mark Cohen,* Assistant Deputy Public Defender, appeared on behalf of appellant Artis (*Mr. Stanley C. Van Ness,* Public Defender, attorney).

*Mr. David S. Baime,* Assistant Prosecutor, argued the cause for respondent in *State v. Artis* (*Mr. Joseph P. Lordi,* Essex County Prosecutor, attorney).

*Mr. David P. Jacobs,* Assistant Deputy Public Defender, appeared on behalf of appellant Wilson (*Mr. Stanley C. Van Ness,* Public Defender, attorney).

*Mr. David S. Baime,* Assistant Prosecutor, argued the cause on behalf of respondent in *State v. Wilson* (*Mr. Joseph P. Lordi,* Essex County Prosecutor, attorney).

*Mr. Richard Newman* argued the cause for appellant Sinclair (*Mr. Stanley C. Van Ness,* Public Defender, attorney).

*Mr. David S. Baime,* Assistant Prosecutor, argued the cause on behalf of respondent in *State v. Sinclair* (*Mr. Joseph P. Lordi,* Essex County Prosecutor, attorney).

*Mr. Edward M. Weisslitz,* Assistant Deputy Public Defender, appeared on behalf of appellant Conklin (*Mr. Stanley C. Van Ness,* Public Defender, attorney).

*Mr. John Corino,* Cape May Prosecutor, appeared on behalf of respondent in *State v. Conklin.*

*Mr. Daniel R. Coburn,* Assistant Deputy Public Defender, appeared on behalf of appellant Kremens (*Mr. Stanley C. Van Ness,* Public Defender, attorney).

*Mr. Alfred M. Bitting,* Assistant Prosecutor, argued the cause for respondent in *State v. Kremens (Mr. Dominick J. Ferrelli,* Burlington County Prosecutor, attorney).

*Mr. Thomas E. Bracken,* Assistant Deputy Public Defender, argued the cause for appellant Thompson *(Mr. Stanley C. Van Ness,* Public Defender, attorney).

*Mr. Charles M. Egan, Jr.,* Morris County Prosecutor, argued the cause for respondent in *State. v. Thompson.*

PER CURIAM. On April 8, 1968 the United States Supreme Court held the federal kidnapping statute unconstitutional insofar as it authorized the death penalty. *United States v. Jackson,* 390 *U. S.* 570, 88 S. Ct. 1209, 20 *L. Ed. 2d* 138 (1968). The statute was construed to mean that the death penalty could be imposed only by a jury verdict, so that if a defendant waived his Sixth Amendment right to trial by jury, he would suffer no penalty beyond life imprisonment. Thus construed, the statute was held to violate the right to trial by jury. The Court also found the statute "needlessly encouraged" a plea of guilty, in violation of the Fifth Amendment privilege against self-incrimination. On June 17, 1968 the United States Supreme Court, upon the Government's concession that the federal bank robbery act was indistinguishable from the kidnapping statute, voided a death sentence imposed under the robbery act. *Pope v. United States,* 392 *U. S.* 651, 88 S. Ct. 2145, 20 *L. Ed.* 2d 1317 (1968).

When *Jackson* was handed down, we immediately invited the question of its impact upon our homicide statute under which the penalty for first-degree murder is death unless the jury recommends life imprisonment, *N. J. S. A.* 2A:113–4, and under which, if a non vult plea to the indictment is accepted by the court, the penalty is life imprisonment or the same as that provided in the case of murder in the second degree, *N. J. S. A.* 2A:113–3. Our statute did not involve a Sixth Amendment issue (a defendant could

not waive a jury and be tried before a judge alone), but the non vult plea raised the question whether *Jackson's* Fifth Amendment thesis embraced our statute.

The issue was presented in post-conviction proceedings as to Forcella and Funicello, both under death sentences theretofore affirmed by us. We held (1) *Jackson* did not apply, for the reasons we stated at length, and that if we should be in error in that regard, then (2) the non vult plea rather than the death penalty would fall, and this because of the history of our statutes. *State v. Forcella,* 52 *N. J.* 263 (1968). Two justices dissented.

We decided *Forcella* on July 3, 1968, a few months after *Jackson.* Both Forcella and Funicello petitioned the United States Supreme Court for *certiorari.* Forcella died later of natural causes. As to *Funicello,* the United States Supreme Court, on June 28, 1971, three years after the filing of our opinion, made this memorandum disposition (403 *U. S.* 948, 91 S. Ct. 2278, 29 *L. Ed.* 2d 859) :

On petition for writ of certiorari to the Supreme Court of New Jersey. Motion for leave to proceed in forma pauperis granted. Petition for writ of certiorari granted. Judgment, insofar as it imposes the death sentence, reversed and case remanded to the Supreme Court of New Jersey for further proceedings. Witherspoon v. Illinois, 391 U. S. 510, 88 S. Ct. 1770, 20 L. Ed. 2d 776 (1968) ; Boulden v. Holman, 394 U. S. 478, 89 S. Ct. 1138, 22 L. Ed. 2d 433 (1969) ; Maxwell v. Bishop, 398 U. S. 262, 90 S. Ct. 1578, 26 L. Ed. 2d 221 (1970) ; and United States v. Jackson, 390 U. S. 570, 88 S. Ct. 1209, 20 L. Ed. 2d 138 (1968). Mr. Justice Black dissents.

On July 23, 1971 the Attorney General filed with the United States Supreme Court a petition for rehearing and a motion for clarification, both of which were denied without comment. 404 *U. S.* 876, 92 S. Ct. 31, 30 *L. Ed.* 2d 125 (1971). We thereupon set down *Funicello* for further argument, and other cases involving the same issue were heard with it.

The Attorney General and the prosecutors took the position that by the *Funicello* memorandum the United States Supreme Court held (1) our statute ran afoul of *Jackson,* and (2) it was the death penalty which fell. The memoran-

dum decision cited *Jackson*. There was some ambiguity by reason of the citation of *Witherspoon, Boulden* and *Max-well*, since they deal with the qualification of jurors in a capital case, an issue which in fact was not involved in *Funicello*, 52 *N. J.* at 292, and which would in any event fall away if there were no death penalty. The summary nature of the disposition after a three-year interval was also perplexing. Nonetheless *Jackson* was cited, and any doubt as to the intention of the United States Supreme Court seems dissipated by the fact that the Court on the same day reversed death sentences in a number of North Carolina cases and in a South Carolina case, citing only *Jackson* and *Pope*. *Atkinson v. North Carolina*, 403 *U. S.* 948, 91 S. Ct. 2283, 29 *L. Ed. 2d* 859 (1971); *Hill v. North Carolina*, 403 *U. S.* 948, 91 S. Ct. 2287, 29 *L. Ed. 2d* 860 (1971); *Roseboro v. North Carolina*, 402 *U. S.* 948, 91 S. Ct. 2289, 29 *L. Ed. 2d* 860 (1971); *Williams v. North Carolina*, 403 *U. S.* 948, 91 S. Ct. 2290, 29 *L. Ed. 2d* 860 (1971); *Sanders v. North Carolina*, 403 *U. S.* 948, 91 *S. Ct.* 2290, 29 *L. Ed. 2d* 860 (1971); *Atkinson v. North Carolina*, 403 *U. S.* 948, 91 S. Ct. 2292, 29 *L. Ed. 2d* 861 (1971); *Thomas v. Leeke*, 403 *U. S.* 948, 91 S. Ct. 2291, 29 *L. Ed. 2d* 860 (1971).

■ We therefore accept the conclusion that the United States Supreme Court has declared the death penalty to be unconstitutional under our statute. The constitutional infirmity being excised from the statute by invalidating the death penalty, the question is whether the remainder of the statutory scheme will survive. We see no reason to doubt that the Legislature would want the remainder of the statute to stand if the death penalty failed, and we see no constitutional difficulty in taking that course. The consequences are the following.

■ The death penalty in *Funicello* is set aside pursuant to the mandate of the United States Supreme Court and the defendant is hereby sentenced to life imprisonment, *nunc pro tunc*, as of the date the death sentence was initially imposed, the defendant to be entitled to the same credits as if

initially sentenced to life imprisonment.[1] A like order will be entered in all the other causes captioned above in which the death sentence was imposed. A like order will be made on motion before us or in the trial court with respect to all other defendants now under a sentence of death. No such order shall delay or affect any appeal with respect to guilt.

A life sentence heretofore imposed upon a jury's recommendation or upon the State's waiver of the death penalty is unaffected. See *Robinson v. United States,* 394 *F. 2d* 823 (6 Cir. 1968), *cert.* denied, 393 *U. S.* 1057, 89 S. Ct. 698, 21 *L. Ed. 2d* 698 (1969); *Parker v. United States,* 400 *F. 2d* 248 (9 Cir. 1968), *cert.* denied, 393 *U. S.* 1097, 89 S. Ct. 892, 21 *L. Ed. 2d* 789 (1969).

Neither a non vult plea nor a judgment heretofore entered upon it will be impaired by our action today. As to any claim of involuntariness in the plea, the governing principles are set forth in *Brady v. United States,* 397 *U. S.* 742, 90 S. Ct. 1463, 25 *L. Ed. 2d* 747 (1970); *Parker v. North Carolina,* 397 *U. S.* 790, 90 S. Ct. 1458, 25 *L. Ed. 2d* 785 (1970); *North Carolina v. Alford,* 400 *U. S.* 25, 91 S. Ct. 160, 27 *L. Ed. 2d* 162 (1970).

All pending and future indictments for murder shall be prosecuted on the basis that upon a jury's verdict of murder in the first degree, the penalty shall be life imprisonment. Pleas to an indictment for murder shall continue to be governed by *N. J. S. A.* 2A:113–3.

The matters captioned above involving interlocutory orders relating to the death penalty are remanded to the trial courts for further proceedings in accordance with this opinion.

---

[1]We have heretofore directed the imposition of life imprisonment where there was error affecting the death penalty and where the State waived a right of retrial with respect to it. See *State v. Holland,* 59 *N. J.* 451, 463 (1971). Since there cannot be a retrial with respect to the death penalty, the State's consent to that course is unnecessary.

Joining in Per Curiam Opinion: Chief Justice WEINTRAUB and Justices PROCTOR, SCHETTINO and MOUNTAIN—4.

Concurring in result: Justices JACOBS and HALL—2.

Dissenting: Justice FRANCIS—1.

WEINTRAUB, C. J. (concurring). Judicial management is high among present priorities. The courts being unable to meet the demands upon them, it is understandable that among the solvents would be a proposal that the judiciary borrow rudimentary principles from the business world. The first rule of good management must be that management shall manage. A work force cannot be effective if it cannot know how it is to function. I can think of no area in which guidance is more vital than the area of criminal law, for it is an area of intense activity, touching every citizen. The case before us dramatizes the failure to provide direction and suggests the Federal and State judiciaries cannot meet their responsibilities unless some rules are changed.

Let us look for a moment at our basic constitutional scheme from which the management problem has emerged. Thirteen uneasy States agreed upon a federal plan under which the big States could not swallow the little ones. The federal government received an assigned role, all else being reserved to the States. The responsibilities of the judicial systems reflect that division. As to federal issues the Federal Supreme Court is supreme and the State Supreme Court is subordinate, while as to all other matters the State Supreme Court is supreme and the Federal Supreme Court is subordinate. The Federal Supreme Court and the State Supreme Court may thus be thought to be equally unequal, but there is a rub, for the Federal Supreme Court has the last word with respect to what the federal jurisdiction includes. Thus the two judiciaries are unequally unequal. And the line between the jurisdictions of the judiciaries being quite imprecise, the power to say where the line lies is the more meaningful on that account.

The area of final responsibility reserved to the State Supreme Court vastly exceeds the area delegated to the Federal Supreme Court. One need but compare the calendars in the trial courts and the numbers of trial judges to appreciate the respective demands upon the two systems. Among the first demands upon the State is the protection of the citizen from criminal attack in his home, in his work, and in the streets. The citizen looks to the State judiciary for fair and effective prosecution of violators of the criminal law. Yet, although the State Supreme Court is thus charged with the responsibility for that result, its power to lay down the rules has been shifted to the Federal Supreme Court by a run of its decisions over the past 12 years or so. Those decisions were not at all compelled by "my copy" of the Constitution or its history. Surely the Federal Supreme Court would not have been derelict if it had left the final power where it had reposed for almost 200 years.

This shift of power is inherently abrasive. To an ardent advocate of "State's rights," the shift of power is of course irritating. To one who is not at all excited in those terms, the shift of power may be no less disturbing, for he wants the power to reside where it can better serve the citizens and he questions the ability of the Federal Supreme Court to manage the additional area it has allocated to itself. If Mr. Justice Holmes was correct when he said the life of the law is experience and not logic, it is understandable that State judges do not believe their federal counterparts are better informed to make value judgments in this area of intense State experience. Indeed, a lack of realism is the persistent criticism of the federal decisions to which I have referred. But apart from all of this, the shift of power has separated the responsibility for the result from the power to lay down the rules. It is this separation which has led to unfortunate friction between the judiciaries. Many citizens, unaware of the significance of this shift of power, continue to charge the State judiciary with the shortcomings in this critical area, while the State judiciary chafes because it is

unable to do what it believes ought to be done, and to boot, it cannot find out in some expeditious way precisely what the Federal Supreme Court wants it to do.

The problem is aggravated by the fact that the Federal Supreme Court does not have the options available to the State Supreme Court. Whereas the State Supreme Court can make new law at a nonconstitutional level, thus leaving the Legislature free to disagree and the Court itself free to change its mind more comfortably if experience should reveal it erred, the Federal Supreme Court cannot itself lay down a rule without attributing it to some constitutional command. It might have been more serviceable merely to have found a federal interest in a subject justifying congressional action rather than to attribute some final solution to the Constitution itself. But that is not the course the Federal Supreme Court pursued. Rather the Court fashioned its own rules and said the Constitution made it do so.

In that process the Federal Supreme Court had to read the Constitution to embrace subjects never thought to be within the Constitution's reach. Indeed the outside limits of the process are not yet visible. After all, good law is a matter of "fairness," and one need but insist that a given rule is "fundamentally" unfair to call upon the Constitution to establish his view. The tendency is thus to claim "constitutional" moment in matters which, in my appraisal, are quite minimal in a scheme of values. The more the Constitution is found to be intolerant of disagreement upon arguable issues, the deadlier becomes the grip upon the genius of men. The price of such intolerance may be sterility. It is true that on occasions, the Federal Supreme Court suggests a new constitutional rule will not deny the States an opportunity to devise another approach. See *Ker v. California,* 374 *U. S.* 23, 33–34, 83 S. Ct. 1623, 1629–1630, 10 *L. Ed. 2d* 726, 738 (1963), as to arrests, searches and seizures; *Miranda v. Arizona,* 384 *U. S.* 436, 444, 467, 86 S. Ct. 1602, 1612, 1624, 16 *L. Ed. 2d* 694, 706, 719–720 (1966), as to confessions; and *United States v. Wade,* 388 *U. S.* 218, 239,

87 S. Ct. 1926, 1938, 18 *L. Ed. 2d* 1149, 1164 (1967), as to line-ups. But no one seems to have found elbow room.

And when it is discovered that the Constitution itself commands a rule, the problem of retroactive application arises, for it sounds horrendous to refuse thus to apply a rule which, by hypothesis, however fictional, the Constitution itself has always demanded. There is no such compulsion when a State Supreme Court makes law at a nonconstitutional level.

The impact of the expansion of the reach of the Constitution in this area is heightened by some further doctrines the Federal Supreme Court has developed. One is that a "constitutional" right is not lost unless it is "waived." Although the Constitution of course secures constitutional rights against legislative impairment, the Constitution nowhere suggests that such rights, unlike rights resting in the common law or in statute, are thrust upon the individual and can be lost only if he elects by some positive decision to forego them. But the Federal Supreme Court has introduced a doctrine of waiver, calling for a relinquishment which must not only be voluntary but also "intelligent," a concept of uncertain meaning in this area. See *State v. Mc-Knight,* 52 *N. J.* 35 (1968). Another doctrine entitles a State defendant to seek post-conviction relief without limit until he has exhausted every conceivable "constitutional" claim by proceedings first in the State courts if they will take the issue and then in the federal courts, no matter how belatedly the claim is raised, so long as he did not voluntarily and intelligently "waive" it. *Fay v. Noia,* 372 *U. S.* 391, 83 S. Ct. 822, 9 *L. Ed. 2d* 837 (1963). A case can become a shuttlecock passing between the Federal and State judiciaries for years.

Nor does the foregoing tell the whole story. Commonly a constitutional question involves no more than a value judgment upon a factual complex rather than an evident application of a precise rule of law, and indeed a value judgment which inevitably reflects the seasoning and experience

of the one who judges. Federal trial judges are thus asked to "review" the judgments of the State Court by no more than a substitution of their factual evaluations for those of the State Court. Hence it may come to pass that a dozen or more years after a conviction is upheld by the State Supreme Court, a man may come to a federal bench who will pit his experienced or sometimes inexperienced assessment against the seasoned evaluations of a host of State judges, and will thereby undo the State court judgment without so much as an intimation of a shadow of a. shadow of a doubt as to the truth of the conviction. The public is understandably confused and may wonder how the State judiciary could be so grievously unjust, although all that is involved is the disagreement of one man, who, if he sat in the State judiciary would have been reversed unanimously or if he sat in the State Supreme Court would have been a lone dissenter. To say he would thus have fared as a member of the State judiciary does not prove he was wrong, but it does put the matter in perspective. I of course intend no broadside against the judges who sit in the United States District Court. I know them very well. They are good men, doing what they conceive the Federal Supreme Court expects them to do. Indeed they may be as unhappy as I with the present scene. My point is that the doctrines of the Federal Supreme Court have led to an impossible situation. There is more than enough work for both judicial systems. Good management calls for husbanding of their energies and the elimination of conflicting judgments which really do little if anything to advance justice.

The case now before us serves to illustrate the difficulties a State judiciary experiences because of the shift to the Federal Supreme Court of the power to lay down the rules in an area of State responsibility.

*United States v. Jackson,* 390 *U. S.* 570, 88 S. Ct. 1209, 20 *L. Ed. 2d* 138 (1968), involved the federal kidnapping statute. The majority of the Supreme Court construed the statute to mean the death penalty could be imposed only by

a jury so that a defendant who contested his guilt before a judge without a jury would experience no greater penalty than life imprisonment. The statute being so construed, it had to follow that the Sixth Amendment right to trial by jury was impaired since a price was obviously exacted for asserting that right. The majority opinion, however, found also an invasion of the Fifth Amendment, on the theme that there was coercion to plead guilty. I could not understand, and still do not, how the Fifth Amendment was involved, for a defendant did not have to plead guilty to avoid the threat of the death sentence. The coercion ran only to the choice of a trial with or without a jury; it had nothing to do with the question whether to defend or not to defend. Indeeed the majority opinion itself acknowledged that its interpretation of the kidnapping statute "hardly implies that every defendant who enters a guilty plea to a charge under the Act does so involuntarily." 390 *U. S.* at 583, 88 S. Ct. at 1217, 20 *L. Ed. 2d* at 148. Rather, the opinion says, the statute "needlessly *encourages*" a guilty plea, although how that can be when a defendant can plead not guilty and be tried by a judge is not explained.[1] Ordinarily the Federal Supreme Court avoids an avoidable constitutional question. If *Jackson* had rested upon the Sixth Amendment alone, the decision would have been complete. That the Court reached for a Fifth Amendment issue was foreboding, but I could not be sure as to what.

It was evident that our homicide statute would be involved if *Jackson* meant to lay down a rule that a statute will violate the Fifth Amendment if the death penalty cannot be imposed upon a plea of guilty. Our statute would be involved because it provides that if a plea of non vult to the indictment is accepted, the penalty shall be life imprisonment or the punishment which may be imposed on a convic-

---

[1] If the Court had in mind that a judge might refuse to hear a case without a jury, the trouble would reside in the judge's refusal rather than the statute. It could not be said it is the statute which "encourages" the guilty plea.

tion for murder in the second degree. *N. J. S. A.* 2A:113–3. Although I was not familiar with the statutory schemes in all the other States which had capital punishment, it was inconceivable that there was not some equivalent method in each whereby a defendant could avoid the death penalty, whether by a plea of guilty to murder in the first degree or by a plea to a lesser included charge. Whatever the technique, the issue would be the same, unless mere form or words could be triumphant. And it seemed to me that there was also implicated the widespread practice known by the unpleasant label "plea bargaining"; for whatever may be the offense charged in the indictment, the same ethics are involved in the acceptance of a plea of guilty to the charge or to some lesser one upon an agreement for more lenient treatment. To say the death penalty is singularly different and to insist that every defendant shall run the risk of death, is to me regressive, for it holds the inevitable promise of a higher incidence of executions. Yet, if the Federal Supreme Court found that intent in the Constitution of the United States, it would be my plain obligation to accept that view and enforce it.

Had the Supreme Court of New Jersey handed down an opinion like *Jackson,* one of the assignment judges responsible for judicial administration in the several vicinages of the State, would have immediately telephoned the Chief Justice, as administrative head of the judiciary, and asked quite bluntly for some guidance as to what was expected. Specifically, the question would be whether the State Supreme Court intended to declare the homicide statute unconstitutional, and if so, whether the death penalty or the non vult plea survived. That guidance would be imperative, for the trial bench must know what to do with murder indictments. But there is no established line of communication between the State Supreme Court and the Federal Supreme Court whereby such information, so obviously needed for intelligent management of judicial business, can be had. All that we could do was to invite the immediate presentation

of the question whether *Jackson* wiped out the death penalty in our State. We did so, with the hope that on an appeal from our decision the Federal Supreme Court would quickly provide essential administrative direction.

*Jackson* was decided on April 8, 1968. The issue was argued before us on June 3, 1968, and our opinion was filed on July 3, 1968. *State v. Forcella, et al.,* 52 *N. J.* 263. We set forth at length why we thought *Jackson* did not apply to our homicide statute, and to avoid further delay in this urgent area, we dealt with the question whether, if *Jackson* did apply, it would be the death penalty or the non vult plea which would fall. That issue we conceived to be one of State law as to which our view would bind the Federal Supreme Court. Upon an examination of the history of our homicide statute we concluded that if *Jackson* applied, it was the non vult plea that would fall.

Forcella, and also Funicello, another defendant in those proceedings, promptly sought review by the Federal Supreme Court. Forcella died of natural causes and his proceeding was dismissed. On June 28, 1971, three years after our decision, the Supreme Court reversed the death penalty in the Funicello matter in a summary way to which I will refer later on. In the intervening three years we and no doubt most other jurisdictions handled murder cases on the assumption that our respective statutes were valid.

During that three-year period, we were led to believe that our statute was not controlled by *Jackson,* not only because the Federal Supreme Court did not act upon *Funicello* but also because of other opinions it handed down during that period. They were *Brady v. United States,* 397 *U. S.* 742, 90 S. Ct. 1463, 25 *L. Ed. 2d* 747 (May 4, 1970) ; *Parker v. North Carolina,* 397 *U. S.* 790, 90 S. Ct. 1458, 25 *L. Ed. 2d* 785 (May 4, 1970) ; and *North Carolina v. Alford,* 400 *U. S.* 25, 91 S. Ct. 160, 27 *L. Ed. 2d* 162 (Nov. 23, 1970). In each of those cases, the defendant sought unsuccessfully to attack his guilty plea, on the basis that the death penalty was unconstitutional under *Jackson* and hence that his plea

was induced by or coerced by his mistaken belief that the death penalty was a risk he faced. *Brady* involved the federal statute found invalid as to the death penalty in *Jackson*. *Parker* and *Alford* involved a State statute which the defendants argued to be within *Jackson*.

*Brady* held that the guilty plea was nonetheless voluntarily and intelligently made. In the course of the discussion, the majority opinion dealt broadly with the subject of plea bargaining, saying (397 *U. S.* at 751–753, 90 S. Ct. at 1471, 25 *L. Ed. 2d* at 758–759) :

> The issue we deal with is inherent in the criminal law and its administration because guilty pleas are not constitutionally forbidden, because the criminal law characteristically extends to judge or jury a range of choice in setting the sentence in individual cases, and because both the State and the defendant often find it advantageous to preclude the possibility of the maximum penalty authorized by law. For a defendant who sees slight possibility of acquittal, the advantages of pleading guilty and limiting the probable penalty are obvious— his exposure is reduced, the correctional processes can begin immediately, and the practical burdens of a trial are eliminated. For the State there are also advantages—the more promptly imposed punishment after an admission of guilt may more effectively attain the objectives of punishment; and with the avoidance of trial, scarce judicial and prosecutorial resources are conserved for those cases in which there is a substantial issue of the defendant's guilt or in which there is substantial doubt that the State can sustain its burden of proof. It is this mutuality of advantage that perhaps explains the fact that at present well over three-fourths of the criminal convictions in this country rest on pleas of guilty, a great many of them no doubt motivated at least in part by the hope or assurance of a lesser penalty than might be imposed if there were a guilty verdict after a trial to judge or jury.
>
> Of course, that the prevalence of guilty pleas is explainable does not necessarily validate those pleas or the system which produces them. But we cannot hold that it is unconstitutional for the State to extend a benefit to a defendant who in turn extends a substantial benefit to the State and who demonstrates by his plea that he is ready and willing to admit his crime and to enter the correctional system in a frame of mind that affords hope for success in rehabilitation over a shorter period of time than might otherwise be necessary.
>
> A contrary holding would require the States and Federal Government to forbid guilty pleas altogether, to provide a single invariable penalty for each crime defined by the statutes, or to place the sentencing function in a separate authority having no knowledge of

the manner in which the conviction in each case was obtained. In any event, it would be necessary to forbid prosecutors and judges to accept guilty pleas to selected counts, to lesser included offenses, or to reduced charges. The Fifth Amendment does not reach so far.

The discourse just quoted, appearing in a case involving a statute authorizing a death penalty, seemed to me to say that capital punishment and plea bargaining were compatible.

In *Parker,* decided the same day as *Brady,* the North Carolina statute at the time of defendant's plea provided for the death penalty unless the jury recommended life imprisonment, and for life imprisonment if a plea of guilty were accepted. We thought it significant that while the dissenting opinion said that *Jackson* applied, the majority studiously avoided a decision upon that question, saying only that "It may be that under *United States v. Jackson,* 390 *U. S.* 570, 88 *S. Ct.* 1209, 20 *L. Ed. 2d* 138 (1968), it was unconstitutional to impose the death penalty under the statutory framework which existed in North Carolina at the time of Parker's plea." 397 *U. S.* at 794–795, 90 S. Ct. at 1461, 25 *L. Ed. 2d* at 790–791. Of moment too was the dissenting opinion's response to the discussion of plea bargaining in *Brady* (397 *U. S.* at 808–809, 90 S. Ct. at 1479, 1480, 25 *L. Ed. 2d* at 798–799) :

The principal flaw in the Court's discourse on plea bargaining, however, is that it is, at best, only marginally relevant to the precise issues before us. There are critical distinctions between plea bargaining as commonly practiced and the situation presently under consideration—distinctions which, in constitutional terms, make a difference. Thus, whatever the merit, if any, of the constitutional objections to plea bargaining generally, those issues are not presently before us.

We are dealing here with the legislative imposition of a markedly more severe penalty if a defendant asserts his right to a jury trial and a concomitant legislative promise of leniency if he pleads guilty. This is very different from the give-and-take negotiation common in plea bargaining between the prosecution and defense, which arguably possess relatively equal bargaining power. No such flexibility is built into the capital penalty scheme where the government's harsh terms with respect to punishment are stated in unalterable form.

Still speaking of pleas of guilty, the dissent said in its footnote 16 that "I do not consider the case of a death penalty scheme that is not unconstitutional under *Jackson.*" The import was that the death penalty could be imposed constitutionally even though there was an opportunity for lesser punishment on a plea. The dissent added that the threat of the death penalty was "a factor to be given considerable weight in determining whether a defendant has deliberately waived his constitutional rights" (397 *U. S.* at 810, 90 S. Ct. at 1480, 25 *L. Ed.* 2d at 799), thus again seeming to agree with the majority's statement in *Brady* with respect to the need and justice of plea bargaining even though capital punishment is involved.

What the dissent appeared to find objectionable was the fact that there was a "legislative imposition" of the death penalty and a "legislative promise of leniency if he pleads guilty." But that is always the case when the bargained result is a plea to less than all charges or to a lesser included offense. The legislature fixes the maximum for all offenses. If a defendant charged with armed robbery pleads to larceny, he thereby avoids one legislatively prescribed maximum and knows he can get no more than the legislatively imposed maximum for the lesser offense. Would the North Carolina statute have fared better if instead of a guilty plea to murder in the first degree, the plea was entered to murder in the second degree? If that is what the turmoil is about, we would need but delete a few words to make our statute match that concept.[2] It cannot be that the Constitution is that interested in mere form.

---

[2]The italicized words could be eliminated from *N. J. S. A.* 2A:113–3:

> In no case shall the plea of guilty be received upon any indictment for murder, and if, upon arraignment, such plea is offered, it shall be disregarded, and the plea of not guilty entered, and a jury, duly impaneled, shall try the case.

> Nothing herein contained shall prevent the accused from pleading non vult or nolo contendere to the indictment; the sentence to be imposed, if such plea be accepted, shall be *either imprisonment for life or* the same as that imposed upon a conviction of murder in the second degree.

*Alford* involved a plea of guilty to murder in the second degree entered by a defendant indicted for murder in the first degree. Again the majority eschewed a denunciation of the State statute, saying only that "In reaching its conclusion, the Court of Appeals relied heavily on *United States v. Jackson,* 390 *U. S.* 570, 88 *S. Ct.* 1209, 20 *L. Ed.* 2d 138 (1968), which the court read to require invalidation of the North Carolina statutory framework for the imposition of the death penalty because North Carolina statutes encouraged defendants to waive constitutional rights by the promise of no more than life imprisonment if a guilty plea was offered and accepted." 400 *U. S.* at 30, 91 S. Ct. at 163, 164, 27 *L. Ed.* 2d at 167. The dissenters again found the North Carolina statute held an unconstitutional threat, but made no further mention of plea bargaining.[3]

Upon the foregoing analysis of *Brady, Parker* and *Alford,* I was persuaded the majority refused to say *Jackson* applied to a statute such as ours and indeed affirmatively recognized the Constitution did not deny in a capital case the advantages of a reduced penalty on a plea. The dissenters, too, seemed to recognize the death penalty could be mitigated under a plea, advancing at most a formalistic criticism which, in my view, would not survive realistic reconsideration. If the death penalty and a plea bargain could coexist, I could see no substantial issue under our statute.

This was the setting when, on June 28, 1971, three years after we decided *Funicello,* the Federal Court handed down this memorandum, 403 *U. S.* 948, 91 S. Ct. 2278, 29 *L. Ed.* 2d 859:

On petition for writ of certiorari to the Supreme Court of New Jersey. Motion for leave to proceed in forma pauperis granted. Petition for writ of certiorari granted. Judgment, insofar as it imposes

---

[3]We add that in *Santobello v. New York,* 404 *U. S.* 257, 92 S. Ct. 495, 30 *L. Ed.* 2d 427 (1971), the Court unanimously agreed that plea bargaining was virtuous. The death penalty was not involved, but none of the opinions suggested it would call for a different answer.

the death sentence, reversed and case remanded to the Supreme Court of New Jersey for further proceedings. Witherspoon v. Illinois, 391 U. S. 510, 88 S. Ct. 1770, 20 L. Ed. 2d 776 (1968) ; Boulden v. Holman, 394 U. S. 478, 89 S. Ct. 1138, 22 L. Ed. 2d 433 (1969) ; Maxwell v. Bishop, 398 U. S. 262, 90 S. Ct. 1578, 26 L. Ed. 2d 221 (1970) ; and United States v. Jackson, 390 U. S. 570, 88 S. Ct. 1209, 20 L. Ed. 2d 138 (1968). Mr. Justice Black dissents.

This was indeed puzzling. The *Jackson* issue was of course involved in *Funicello;* we had decided that issue to the end that the mist might be lifted by a prompt appeal. But *Funicello* did not involve the *Witherspoon* issue (52 *N. J.* at 292), and hence I could not understand the reference to *Witherspoon, Boulden* and *Maxwell,* all of which dealt with the qualification of jurors in a capital case. And even if *Witherspoon* were involved, why talk about how a jury is selected in a capital case if because of *Jackson* there is no death penalty? And of course I was surprised that the Court would dispose of so important an issue without argument, oral or written (we are told that no answer was filed to Funicello's petition for *certiorari*).

And puzzling, too, was the silence which followed the *Funicello* disposition. Here was a decision which, if our *per curiam* today is correct, not only empties the death house in our State but should do the same in every State if my further assumption is accurate that every State with capital punishment has some technique, formalized or not, whereby a defendant can avoid the risk of death by pleading guilty to some charge. Yet not a single news service detected the vast implications of that little note. Even victorious counsel, who usually greet success effusively, were strangely silent, as if they could not believe what they read.

We immediately informed the Attorney General of the State that we would want his views upon the *Funicello* memorandum in further proceedings on the remand. The Attorney General promptly moved before the Federal Supreme Court for rehearing and for clarification. The applications were denied without comment. 404 *U. S.* 876, 92 S. Ct. 31, 30 *L. Ed.* 2d 125 (1971). Thereupon we ordered further

argument before us. Extensive briefs were filed, and virtually a full day was devoted to the hearing, both as to what *Funicello* meant and what *Funicello* would permit.

I regret to say that the Federal Supreme Court's handling of this important subject is not my idea of effective judicial administration. An appeal to the highest authority, Federal or State, should be more rewarding than a trip to Delphi. When *Jackson* was decided, the Court must have known of the possible implications of that case on capital punishment within the 50 States if the Fifth Amendment question was accepted. The States should have been invited to participate, not only to give them a hearing, but also so that the Court could profit from the practical experience of State authorities charged with enforcement of the criminal laws. And surely it is not too much to expect a sentence or two, articulating a constitutional finding in plain, unequivocal words.

At this further argument before us, the Attorney General and the prosecutors took the position that *Funicello* meant that *Jackson* applied to our statute and invalidated the death penalty. I think the *Funicello* memorandum must be so interpreted. But I will continue to marvel that the Fifth Amendment was found to harbor the grisly proposition that every defendant must risk death, that his privilege against self-incrimination is a noose around his neck. This, to me, is the Constitution "standing on its head."

But my concern at the moment is with judicial management. There has been a suspension of capital punishment in this country for a number of years — since 1963 in our State. The reason is that the Federal Supreme Court has not reached for and resolved known issues as to the constitutionality of capital punishment. The failure to do so has effectively ended capital punishment with respect to every defendant sentenced to death before the Federal Supreme Court lays the issues to rest. There are now almost 700 men on death row in the nation. It is inconceivable that so many could be executed in one fell swoop. Executive clemency is inevitable. Meanwhile the drain upon the time and energy of

the State judiciaries is tremendous. Whatever one's view upon the merits of capital punishment, he cannot say this is an example of businesslike management.

The management problem is not all confined to capital punishment. The judicial process in the entire area of criminal law is a mess. A school boy, if he knew what we do, would stop and wonder. Changes must be made if the judiciaries, State and Federal, are to serve their common employer.

It would be well to reunite the power to lay down the rules with the responsibility for the end result. Perhaps the concept of two separate judicial systems is anachronistic. Perhaps the federal courts should try all State crimes; surely the State courts would still have more than enough to do. I appreciate that some of the new constitutional precepts reflect a purpose to protect minorities from discrimination. No one can quarrel with that objective; a constitution can have no role more vital. Perhaps it would have been better to have gone directly to that end by removing to the federal court for trial any case in which the possibility of such injustice might be feared.

In any event, there must be some effective channel of communication if we are to overcome the problem generated by the shift of constitutional authority to the Federal Supreme Court. The case-by-case method of making law is intolerably inefficient. We are not dealing with some sometime issue. The criminal law teems with activity which every day touches the safety of more than two hundred million people. The police, the prosecutors, and the judges must know promptly what may and may not be done. A system offers no prospect of management when after ten years with *Mapp v. Ohio,* 367 *U. S.* 643, 81 S. Ct. 1684, 6 *L. Ed. 2d* 1081 (1961), the Federal Supreme Court had to acknowledge it had not achieved a serviceable set of guidelines. *Coolidge v. New Hampshire,* 403 *U. S.* 443, 91 S. Ct. 2022, 29 *L. Ed. 2d* 564 (1971). See *State v. Bisaccia,* 58 *N. J.* 586 (1971). I believe the case method should be replaced by a rule-making process in which

the Federal Supreme Court can meet regularly with representatives of State Supreme Courts, to become aware of their problems, to benefit from their experience, and to adopt rules of prospective application. Without some such approach, neither the Federal Supreme Court nor the State Supreme Courts can be equal to their responsibilities.

There has been an upsurge in violent crime in the past decade. Everybody blames someone else. There is enough blame to go around, and I think the judiciaries cannot escape a considerable share.

Mr. Justice PROCTOR and Mr. Justice SCHETTINO join in this concurring opinion. Subject to his dissenting opinion, Mr. Justice FRANCIS also joins herein.

JACOBS and HALL, JJ., concur in result for reasons fully set forth by them in their dissent to *State v. Forcella et als.,* 52 *N. J.* 263, 294–302 (1968).

FRANCIS, J. (dissenting). I adhere to the opinion of this Court in *State v. Forcella,* 52 *N. J.* 263 (1968).

In *Forcella,* the majority of this Court in a comprehensive opinion declared that the view expressed by the United States Supreme Court in *United States v. Jackson,* 390 *U. S.* 570, 88 S. Ct. 1209, 20 *L. Ed.* 2d 138 (1968) did not render the death penalty provision of the New Jersey homicide statute unconstitutional. I believe our decision was sound and I see nothing either in the later summary and unexplained reversal of *Forcella* by that Court, 403 *U. S.* 948, 91 S. Ct. 2278, 29 *L. Ed.* 2d 859 (1971), or the subsequent rejection of the Attorney General's plea for clarification, 404 *U. S.* 876, 92 S. Ct. 31, 30 *L. Ed.* 2d 125 (1971), which persuasively leads to a contrary result. In a case which had nationwide implications concerning the conviction and death sentence of almost 700 persons on death row throughout the country, one would expect a more definitive exposition from the tribunal which is invested with the final word on constitutional problems.

No one suggests that if our homicide act simply provided that any person indicted for murder shall have his guilt determined by a jury, which on finding guilt, shall fix the penalty at death or may in its discretion recommend life imprisonment, the Federal or State Constitution would be violated. Absence of any authorization for offer or acceptance of a guilty or *non vult* plea would not affect the Act's validity. *Jackson* plainly indicates that a homicide statute which left the choice of death or life imprisonment in every case to the jury, regardless of how guilt was determined, would present no constitutional problem. *United States v. Jackson, supra,* 390 *U. S.* at 582, 88 *S. Ct.* at 1216, 20 *L. Ed.* 2d at 147. Likewise in *North Carolina v. Alford,* 400 *U. S.* 25, 39, 91 S. Ct. 160, 168, 27 *L. Ed.* 2d 162, 172 (1970), Mr. Justice White, speaking for the majority of the Court, in discussing the validity of a state law which required every person accused of murder to go to trial, said:

The States in their wisdom may take this course by statute or otherwise and may prohibit the practice of accepting pleas to lesser included offenses under any circumstances. But this is not the mandate of the Fourteenth Amendment and the Bill of Rights.

But, indicated the Court in *Jackson,* if the Legislature for the purpose of ameliorating the harshness of a rule requiring every person indicted for murder to stand trial and face a possible death verdict, adds to the homicide act a provision under which such an accused may, if he wishes, voluntarily and intelligently and with a realization of the case against him offer to admit his guilt and to accept a term of imprisonment, subject to acceptance or rejection of the plea by the trial court, such amendment changes the death penalty provision into an unconstitutional scheme. Never has such a humane legislative endeavor encountered such a cataclysmic rebuff or been converted to the accomplishment of a purpose wholly at odds with the legislative intention. In my judgment the view taken by the majority of our Court

in *Forcella* as to the propriety and effect of the authorization of the *non vult* plea is compatible with the Federal and State Constitutions.

I realize that in our country's judicial hierarchy, the United States Supreme Court is the final arbiter of controversies involving interpretation and application of the Federal Constitution. Thus if the *Funicello* reversal signifies what the majority of this Court with obvious reluctance accepts it to mean, the ruling cannot be disregarded. But even if not privileged to disregard an interpretation of the Constitution by the United States Supreme Court, I am privileged to disagree, and to express that disagreement. I agree with the dissenting Justices in *United States v. Jackson, supra*, 390 *U. S.* at 591, 88 S. Ct. at 1221, 20 *L. Ed.* 2d at 152, White and Black, JJ., dissenting, and I also believe firmly that the opinion of this Court in *Forcella* represents a sound appraisal of the constitutionality of our homicide statute.

## I

For me further analysis of the procedure which brought the *Jackson* problem to court intensifies the difficulty of understanding the significance of the final decision. Jackson was charged in one count of an indictment under the Federal Kidnaping Act, 18 *U. S. C. A.* § 1201(a), with kidnaping and not releasing the victim unharmed, an offense punishable by death, if the jury so recommended. Before *any plea* was entered thereto, Jackson moved to dismiss the count on the ground that the portion of the statute on which it was predicated was unconstitutional. Since defendant had not yet entered any plea to the charge—not guilty, guilty, *non vult or nolo contendere*—obviously the only issue presented was whether the portion of the statute concerning jury trial was unconstitutional on its face. At one point in the opinion the majority seems to so hold:

Our problem is to decide whether the Constitution permits the establishment of such a death penalty, applicable only to those defendants who assert their right to contest their guilt before a jury. The *inevitable* effect of any such provision, is of course, to discourage assertion of the Fifth Amendment right not to plead guilty and to deter exercise of the Sixth Amendment right to demand a jury trial. If the provision had no other purpose or effect than to chill the assertion of constitutional rights by penalizing those who choose to exercise them, then it would be patently unconstitutional. 390 *U. S.* at 581, 88 S. Ct. at 1216, 20 *L. Ed.* 2d at 147. (Emphasis added.)

Additional comment gave the same impression when it indicated that the "chilling effect" of the death penalty provision on the exercise of a defendant's Fifth and Sixth Amendments rights was "unnecessary and therefore excessive" *Id. at* 582, 88 *S. Ct.* at 1216, 20 *L. Ed. 2d* at 147. Thereafter, the opinion said that:

It is no answer to urge, as does the Government, that federal trial judges may be relied upon to reject coerced pleas of guilty and involuntary waivers of jury trial. For the evil in the federal statute is not that it necessarily *coerces* guilty pleas and jury waivers but simply that it needlessly *encourages* them. A procedure need not be inherently coercive in order that it be held to impose an impermissible burden upon the assertion of a constitutional right. Thus the fact that the Federal Kidnaping Act tends to discourage defendants from insisting upon their innocence and demanding trial by jury hardly implies that every defendant who enters a guilty plea to a charge under the Act does so involuntarily. The power to reject coerced guilty pleas and involuntary jury waivers might alleviate, but it cannot totally eliminate, the constitutional infirmity in the capital punishment provision of the Federal Kidnaping Act. 390 *U. S.* at 583, 88 S. Ct. at 1217, 20 *L. Ed.* 2d at 148.

The purport of this language is that in the hypothetical situation envisioned, a plea of guilty to a charge involving the death penalty under the Act would be valid constitutionally, if made voluntarily. Accepting that view, the Act could not be unconstitutional on its face, but only in its *application* in a given case. Consequently, it would seem that as a matter of sound and practical administration of the criminal law, the case before the Court should have been remanded to the trial court for the making of an

adequate record, *i. e.*, one that would permit a decision as to whether the Act was being applied against Jackson constitutionally. For example, if Jackson had been called upon to plead to the indictment, plea negotiations (which certainly have the blessing of the United States Supreme Court as "an essential component of the administration of justice," *Santobello v. New York,* 404 *U. S.* 257, at 260, 92 S. Ct. 495, at 498, 30 L. Ed. 2d 427 (1971))[1] might have resulted in a voluntary offer by him and acceptance by the trial court of a guilty or *nolo contendere* plea. In that event there would have been no problem about the basic validity of the statute. It is plain to me that such is the view of the dissenting Justices in *Jackson, supra.* On the other hand, if Jackson chose "to contest his guilt" and was "ingenuous enough to seek a jury acquittal * * *" (390 *U. S.* at 573, 581, 88 S. Ct. at 1211, 1216, 20 *L. Ed.* 2d at 142, 148), the constitutional question arising from the unique statutory scheme (*i. e.*, waiver of jury trial and trial of the guilt issue before a judge in which event a death penalty was impermissible, or demand for jury trial of the guilt issue, in which event a jury finding of guilt could result in a death sentence, if the jury so recommended), clearly would be open for consideration by the court.

Since Jackson neither pleaded innocent and sought a jury trial, nor offered to waive a jury and to be tried before a judge, (an offer which the trial court in its discretion could reject (*Singer v. United States,* 380 *U. S.* 24, 85 S. Ct. 783, 13 *L. Ed.* 2d 630; *United States v. Jackson, supra,* 390 *U. S.* at 584, 88 S. Ct. at 1217, 20 *L. Ed.* 2d at 148)) nor pleaded guilty, in whole or in part to avoid a possible death sentence, the majority opinion, in my judgment, possesses an internal inconsistency and ambiguity which could not help but puzzle State courts, and which probably would have been avoided by a proper record. The result gives force to the view of the

---

[1] Our courts have long held the view that there is nothing unholy about honest plea bargaining in criminal cases even where the death penalty is involved. *State v. Taylor,* 49 *N. J.* 440, 455 (1967).

dissenting Justices that the majority should heed the traditional policy of declining to reach out for a constitutional question if the statute involved is reasonably susceptible of an interpretation which will avoid such question. They said, and I think rightly so, that they "would not take the first step toward invalidation of statutes *on their face* because they arguably burden the right to jury trial." *United States v. Jackson, supra,* 390 *U. S.* at 592, 88 S. Ct. at 1222, 20 *L. Ed.* 2d at 153. (Emphasis added.)

In *Forcella* Chief Justice Weintraub referred to a basic infirmity in the Federal Kidnaping Act which is not present in the New Jersey homicide statute. In the former, if a defendant who maintained his innocence offered to waive jury trial and to be tried by a judge, and an agreement was reached to that end, upon conviction by the judge, the death penalty could not be imposed. But if the offer to waive the jury was denied by the court and the issue of innocence thereupon necessarily tried by a jury, defendant was subject to the death penalty if the jury convicted him. It certainly is reasonable to hold that such a statutory framework unconstitutionally burdens the Sixth Amendment right of an accused to have his innocence decided by a jury. If, as the dissenters intimated, a proper record had been made in the trial court and presented to the Supreme Court, little criticism could be voiced against the *Jackson* advisory opinion. And, of additional significance, as far as the New Jersey Act is concerned, in *no* case can a defendant who asserts his innocence to a murder charge, obtain a trial by a court without a jury.

The later cases vindicated the judgment of the dissenters. In *Brady v. United States,* 397 *U. S.* 742, 90 S. Ct. 1463, 25 *L. Ed.* 2d 747, and *Parker v. North Carolina,* 397 *U. S.* 790, 90 S. Ct. 1458, 25 *L. Ed.* 2d 785, both decided on May 4, 1970 and *North Carolina v. Alford, supra,* 400 *U. S.* 25, 91 S. Ct. 160, 27 *L. Ed.* 2d 162, decided November 23, 1970, a new majority, consisting in part of the *Jackson* dissenters, recognized that both the Federal Kidnaping Act and the

North Carolina homicide statute (which permitted a death sentence only if a jury after trial did not recommend life imprisonment), were not unconstitutional on their face. In spite of the statement of the majority of the Court in Jackson that the "inevitable effect" of such statute was to "needlessly encourage" guilty pleas in order to avoid the risk of the death penalty, it was held that a plea of guilty, even if made in material part to avoid exposure to the death penalty at a trial, was not constitutionally infirm, so long as it was voluntarily and intelligently made, upon advice of competent counsel, and with an understanding of the strength of the Government's case against him. Moreover, in *Alford* the majority said that even if in offering the plea of guilty, the defendant maintained his innocence, the plea would be valid providing the trial court, after hearing the nature of the prosecution's case and the statement of defense counsel and the defendant, was satisfied that the plea was voluntarily and understandingly made.

It is apparent that in all three of the cited cases, *Brady, Parker* and *Alford,* following return of the murder indictments *pro forma* and perfunctory pleas of not guilty had been entered. Obviously, plea bargaining followed which resulted in an agreement between the parties that the State or Government would waive its right to seek the death penalty, and that in return the defendant, in full appreciation of the case against him and the possibility or probability of a death sentence at a trial, would plead guilty or *non vult,* and accept a sentence of imprisonment in place of the possibility of a death verdict on a jury trial. As Mr. Justice White said for the Court in *Brady*:

But we cannot hold that it is unconstitutional for the State to extend a benefit to a defendant who in turn extends a substantial benefit to the State and who demonstrates by his plea that he is ready and willing to admit his crime and to enter the correctional system in a frame of mind that affords hope for success in rehabilitation over a shorter period of time than might otherwise be necessary. 397 *U. S.* at 753, 90 S. Ct. at 1471, 25 *L. Ed.* 2d at 759.

The *Jackson* opinion found the Federal Kidnaping Act deficient because it subjected to the risk of death any defendant who asserted his innocence and in order to pursue an acquittal demanded a jury trial. The New Jersey statute says that for murder in the first degree the punishment shall be death unless the jury upon and after a consideration of all the evidence recommends life imprisonment. *N. J. S. A.* 2A:113–4. It provides also that in "no case" of an indictment for such a murder shall a plea of guilty be received upon arraignment, and if offered "it shall be disregarded, and the plea of not guilty entered, and a jury, duly impaneled, shall try the case." *N. J. S. A.* 2A:113–3. It is further provided that a plea of *non vult* may be offered and accepted in the discretion of the court, and if accepted the sentence shall be either imprisonment for life or the same as that imposed for second degree murder.[2] *Id.* Thus, in New Jersey a defendant cannot waive a jury trial in a murder case and agree to be tried by a judge alone.

When an accused under a murder indictment is arraigned, a plea of not guilty is entered automatically, and without regard to whether he claims to be innocent. Under the statute there is no alternative. It is conceivable, although it would be a rarity because of the short time usually intervening between return of the indictment and arraignment, that the prosecutor and defense counsel, through negotiation, might arrive at an agreement under which on the day of arraignment, the prosecutor would waive trial and a demand for the death penalty, and the defendant would offer a plea of *non vult* to the court. That unlikely event aside, after the usual arraignment, the prosecutor and defense counsel would engage in plea bargaining (except possibly in the situation discussed hereafter). If agreement for a non-vult plea by de-

---

[2]In this connection, the extensive area for plea bargaining under the statute should be realized. Sentence for second degree murder can range from a very short term, to imprisonment up to 30 years, or even to probation. *N. J. S. A.* 2A:113–4, see *e. g. State v. Bess*, 53 *N. J.* 10, 18–19 (1968).

fendant were reached, it would be recommended to the court, which would accept it only after a thorough inquiry as to whether it was uncoerced and voluntarily made, and that the public interest would be served by its acceptance. See *State v. Sullivan*, 43 *N. J.* 209 (1964), *cert. den.* 382 *U. S.* 990, 86 S. Ct. 564, 15 *L. Ed.* 2d 477 (1966).

What the United States Supreme Court overlooked in the summary reversal of *Funicello, supra,* 403 *U. S.* 948, 91 S. Ct. 2278, 29 *L. Ed.* 2d 859 (1971), as will appear more fully hereafter, is that the Legislature added the opportunity to plead *non vult* to our Act as a humanitarian gesture, and to make plain that plea bargaining was permissible and approved for those defendants who wished to acknowledge their wrongdoing and seek an opportunity to expiate it by rehabilitative confinement. If the amendment had not been made, can there be any doubt that plea bargaining would have been a proper practice, as it had been for many years in our State, and quite obviously, as it had been on the Federal scene and that of our sister States? *Compare Brady v. United States, Parker v. North Carolina, North Carolina v. Alford,* all *supra,* and see *The Challenge of Crime in a Free Society, Report of the President's Commission on Law Enforcement and Administration of Justice* 135 (1967) ; *State v. Taylor, supra, fn.* 1. To my mind, the transmutation of the Legislature's public spirited intention and effort to ease the way for plea negotiation into an allegedly unconstitutional device to burden the right to jury trial and thus to render the death penalty provision invalid is, at best, an unjustified enlargement of the Constitution. As a result, to paraphrase Mr. Justice White's dissent in *Harrison v. United States,* 392 *U. S.* 219, 235, 88 S. Ct. 2008, 2017, 20 *L. Ed.* 2d 1047, 1059 (1968), "[c]riminal trials will simply become less effective in protecting society against those who have made it impossible to live today in safety."

Ordinarily after entry of the perfunctory not guilty plea to the murder indictment, the prosecutor decides whether the homicide is such a horrendous one and the defendant's guilt

so plain that in the public interest he should not engage in plea bargaining, but should go to jury trial (as the statute says) and seek the death penalty as punishment for the defendant and as a deterrent to others. If that decision is reached defense counsel is so advised and, with rare exceptions, the possibility of plea bargaining ends. Of course, the defendant may, over the prosecutor's objection, offer a *non-vult* plea to the trial court, and the court may accept or reject it.

In two of the cases involved here, *State v. Belton,* 48 *N. J.* 432 (1967), and *State v. Conklin,* 54 *N. J.* 540 (1969), both of which resulted in death verdicts, the opinions of this Court reveal that over the prosecutor's objection the defendants made formal offers to plead *non vult*. In each instance the offer was refused by the trial court because it believed that in view of the nature of the crime, the public interest would be better served by rejection of the plea and sending the case to the jury. At Belton's trial, as this Court's opinion notes, *State v. Belton and Neil,* 60 *N. J.* 103 (1972), he acknowledged the robbery and the killing and aimed his defense at obtaining a life recommendation from the jury. There never was a claim of innocence, and the testimony as to his guilt was "overwhelming." And in *Conklin* this Court in sustaining the trial court's rejection of the *non-vult* plea offer said "there was not only armed robbery with killings in the course thereof, but [as the State's brief stresses,] evidence of 'cold-blooded' murder by the defendant and conduct on his part which was 'savage beyond description.'" *State v. Conklin,* 54 *N. J.* at 547.[3]

---

[3]The same situation may be found in the record in every case referred to here. For example, in *State v. Artis,* 57 *N. J.* 24, 26 (1970), this Court described the killing as "this particularly gruesome homicide"; *State v. Funicello,* 49 *N. J.* 553 (1967) arose out of a brutal multiple stabbing in the perpetration of a robbery; a confession was made and received in evidence; the record "overwhelmingly" supported the guilty verdict; *State v. Trantino,* 44 *N. J.* 358 (1965), was a cold-blooded and sadistic murder of police officers and the proof of guilt was overwhelming; *State v. Forcella,* 35 *N. J.* 168 (1962) in

In the other cases now under consideration, trial of the indictment resulted also because the prosecutor demanded the death penalty, as he was entitled to do, and thus the statutory mandate for a jury to decide that issue had to be followed.

Jury trial of the death penalty cases here did not arise because the defendants were "ingenuous" enough to demand such a trial. It arose because the statute prescribed that type of trial, and because the prosecutor sought the death penalty, the determination of which did not admit of any departure from a jury trial.

We know that in practice in our State, a prosecutor does not seek the death penalty unless he believes the killing is so horrendous and the defendant's guilt so plain that his duty to the public demands it, either as punishment or as a deterrent measure or both. Otherwise, the death penalty is waived as the prosecutor is authorized to do. It is a matter of common knowledge that such waiver is the rule, and that the State's demand for jury determination as to whether a death sentence is warranted occurs in a small percentage of murder cases. The jury returns a death sentence in about a third of these cases.

In the death sentence cases now before us, the prosecutor sought the death penalty, following the indictments and the automatic not guilty pleas. This meant under the statutory mandate that a jury had to be impaneled and the cases tried. *N. J. S. A.* 2A:113-3.[4] In each case 12 conscientious citizens of the counties involved found not only that the mur-

---

which the proof of guilt was abundant, and it appeared that defendant had committed a previous murder for which after serving a term in prison he had been released on parole.

[4]Experience has taught that in such cases although the State is required formally to prove guilt with all the solemnity that ordinarily attends an actual contest on the subject, the defendant usually sits in court awaiting the opportunity to admit the killing and to present any circumstances which he hopes may induce the jury to recommend life imprisonment instead of death. *Cf. State v. White*, 27 *N. J.* 158, 186 (1958), (concurring opinion).

der was so revolting, and the defendant's guilt so overwhelming but also such absence of mitigating circumstances, that the discharge of their obligation to society required them to impose the death penalty. Now, as the result of *United States v. Jackson, supra,* the majority of our Court feel required to vacate the death sentences which the various juries deemed necessary for the protection of society and the just administration of the criminal law. It follows also, as the Chief Justice's concurring opinion in this case suggests, that all of the 20 persons who have accumulated on "death row" over the last eight years, because of delays caused by appellate and post-conviction review of the juries' death sentences, must now be freed from those sentences. If the death penalty is capable of producing any deterrent effect in our present day society, and the Legislature must have thought so or it would not have been retained in our statute, the kind of administration of the criminal law described in the Chief Justice's concurring opinion must dissipate any such effect.[5]

The question whether the death penalty is a deterrent is not the concern of the judicial department of the government — unless perhaps, a court is ready to decide that such penalty constitutes cruel and unusual punishment in violation of the Eighth Amendment of the Federal Constitution. The death penalty is a matter of legislative policy, and under our tripartite form of government the decision as to its existence is committed to the Legislature. No matter how I feel about its wisdom, I believe my duty as a judge is to serve the legislative policy which has sanctioned it unless it trans-

---

[5]Current reports do indicate a progressive rise in the crime rate. For example, the FBI's Uniform Crime statistics show that for the first nine months of 1971 violent crimes rose 21% in the heavily populated Northeast, and 14% in the West. Nationwide, murder was up 10%, robbery up 12%, aggravated assault up 8%, and forcible rape up 7%. In New York City in the year 1971 there were 1625 homicides — more than ever before; 172 persons were slain in December, a record for a single month. New York Times, Jan. 1, 1972, p. 1, col. 6.

gresses the State and Federal Constitutions. Since I continue to hold to the view of the majority of our Court in *State v. Forcella* that our statute is constitutional, I cannot accept the contrary holding in this case.

## II

Since the *per curiam* majority opinion herein must be accepted as the law of this State, a decision is necessary as to its present and future impact on our homicide statute. Obviously the opinion means that all persons whose guilt of murder in the first degree has been established and who have been sentenced to death as the result of the refusal of the jury to recommend life imprisonment, must be relieved of that penalty and resentenced to life imprisonment. It follows also that no person who committed a homicide prior to the filing of our judgment in the cases now before us can be exposed to the death penalty at a trial.

But what should be the effect of the decision upon the homicide act for the future? The opinion says all future indictments for murder "shall be prosecuted on the basis that upon a jury's verdict of murder in the first degree, the penalty shall be life imprisonment." To the extent that future indictments emanate from murders committed prior to the judgment in this case, I agree that the punishment must be limited to life imprisonment. However, I dissent from the view that life imprisonment is the only available penalty under the statute for homicides committed thereafter.

We said in *Forcella* that if the effect of the legislative addition of an authorization to the trial court to accept or reject a *non-vult* plea to the murder indictment was to make the long standing death penalty provision violative of the Federal Constitution, then the authorization to offer and receive such a plea should be severed from the rest of the statute. *State v. Forcella*, 52 *N. J.* at 281–284. This was consistent with our unanimous earlier view in *State v. Sullivan, supra,* 43 *N. J.* at 242–247, which discussed at length

the legislative history of our statute, and in *State v. Reynolds*, 43 *N. J.* 597, 603 (1965).

When the United States Supreme Court in *Jackson* declared invalid the death penalty amendment to the Federal Kidnaping Act, it was faced with the need for a decision as to the effect thereof on the remainder of the Act. In resolving the question, reference was made to the established rule that the unconstitutionality of part of a statute does not necessarily mean that its remaining provisions must fall. If the remainder may stand and operate independently without conflict with the over-all basic purpose of the Legislature, it will be allowed to do so. "Unless it is evident that the legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law." *United States v. Jackson, supra,* 390 *U. S.* at 585, 88 S. Ct. at 1218, 20 *L. Ed.* 2d at 149.

The Federal Supreme Court pointed out that the Federal Kidnaping Act had been in existence since 1932. Originally the penalty for violation was imprisonment for a term of years. It was then a wholly viable, fully integrated piece of legislation. When the death penalty was added in 1934, the statute was left substantially unchanged in every other respect. On the basis of the Congressional history, the opinion said that clearly Congress "would have made interstate kidnaping a federal crime even if the death penalty provision had been ruled out from the beginning. It would be difficult to imagine a more compelling case for severability." *Id.* at 589, 88 S. Ct. at 1220, 20 *L. Ed.* 2d at 151. Consequently only the death penalty was excised, and the remainder of the Act was continued in force.

Every factor which impelled the survival of all of the Federal Act except the death penalty provision, applies with equal force to the New Jersey homicide statute but calls for excision of the *non-vult* plea amendment. Prior to that amendment, the Act which included the death penalty was a fully operative, constitutionally viable enactment. See

*State v. Forcella, supra,* 52 *N. J.* at 277–279; *State v. Sullivan, supra,* 43 *N. J.* 209, 242–247. However, its operation was harsh and most defendants indicted for murder were in serious danger of the death penalty. But no one claims that in its then existing form it transgressed the Constitution in the *Jackson* sense. In fact, as indicated above, the United States Supreme Court declared in *Alford* that a State may ban all pleas and require every defendant in a murder indictment to go to jury trial, with the jury deciding whether the crime warranted the death penalty or life imprisonment. In amending our statute, the *non-vult* plea was intended to benefit all murder defendants by permitting the court, where the facts so warranted, to accept a plea which would bar the death penalty. *State v. Forcella,* 52 *N. J.* at 278. If the incorporation of that beneficent purpose imposed an unintended unconstitutional cast on the pre-existing death penalty provision, in view of the fact that the legislative history shows beyond reasonable question that there was no intention to imperil the death penalty, the remedy must be excision of the amendment which caused the difficulty.

In order that our considered holding in *Forcella* be brought into proper perspective here it seems worthwhile to repeat what was said:

\* \* \* We heretofore said that if the *non vult* plea involved a constitutional infirmity, the provision for the *non vult* plea would fall and a defendant who stood trial could claim no benefit from that infirmity. \* \* \*

This must be so because we could not find the Legislature was so determined to have the *non vult* plea that it would prefer to scuttle capital punishment. \* \* \*

Finding no conceivable basis for saying the legislators who voted for the 1893 act intended to abolish capital punishment if necessary to permit a *non-vult* plea, we must hold it would be the *non-vult* plea which died aborning, because of the constitutional impediment to its being.

\* \* \* \* \* \* \* \*

In any event, it is crystal clear the Legislature could not have intended that a constitutional difficulty in the 1917 statute [which authorized a sentence of life imprisonment on a *non vult* plea] should be resolved by eliminating the death penalty. On the contrary

the Legislature had just rejected an attempt to abolish capital punishment, and had decided to go no further than to empower the jury to recommend life imprisonment.

 \* \* \* \* \* \* \* \*

The history of capital punishment in this State is well documented. In that light, we could hardly accept the extraordinary proposition that the 1893 act or the 1917 act, or any general revision of the laws, spelled out an intent that the death penalty should fall if the introduction of the *non vult* plea created a constitutional impasse. Capital punishment lies within the authority and the responsibility of the Legislature, and the Legislature has expressly and continuously dealt with the subject. There have been numerous efforts to abolish it. As recently as 1964 a study commission created by joint resolution of the Legislature recommended that the death penalty be retained. *Report of New Jersey Commission to Study Capital Punishment.* (Oct. 1964). It is not our responsibility, or authority, whatever our individual views on capital punishment, to impute to the Legislature a repeal it has consistently refused to enact during more than a century of agitation upon this subject.

It follows, then, that if *Jackson* is held to apply, the *non vult* plea will go. \* \* \* 52 *N. J.* at 281–283.

I see no reason whatever for departing from the views so expressed.

With the *non-vult* plea out of the homicide act, here is the way the remaining pertinent sections will appear:

*N. J. S. A.* 2A:113–3.

In no case shall the plea of guilty be received upon any indictment for murder, and if, upon arraignment, such plea is offered, it shall be disregarded, and the plea of not guilty entered, and a jury, duly impaneled, shall try the case.

*N. J. S. A.* 2A:113–4.

Every person convicted of murder in the first degree, his aiders, abettors, counselors and procurers, shall suffer death unless the jury shall by its verdict, and as a part thereof, upon and after the consideration of all the evidence, recommend life imprisonment, in which case this and no greater punishment shall be imposed.

Every person convicted of murder in the second degree shall suffer imprisonment for not more than 30 years.

Obviously, they are fully operative as a law without the *non-vult* plea provision, and may stand independently, as they stood for many years before the inclusion of that provision.

The result of excision of the *non-vult* provision is to require every first degree murder defendant to be put to trial before a jury, which will be called upon to decide guilt and death or life imprisonment. I agree that is a harsh result, but it follows inevitably from the United States Supreme Court fiat in *Jackson*. However, the continued existence of the Act in that form is a matter of policy for legislative and not for judicial decision. The lawmakers have the undoubted authority to leave it in that posture, if they feel that the public interest is served thereby.[6] We have noted in the past that a prosecutor may indict specifically for second degree murder in a proper case, thus eliminating the death penalty. *State v. Sullivan, supra,* 43 *N. J.* at 246. The majority of this Court has also said that he may waive the death penalty following return of the usual form of murder indictment, if in his discretion the offense and the public interest do not require such consequences.

It is reasonable to suppose that the Legislature in the discharge of its governmental function will take a conscientious look at the problem. A number of courses are open to it:

1. The death penalty may be abolished entirely;

2. The *non-vult* plea may be added again to the statute with the proviso that in first degree murder cases, unless the prosecutor waives the death penalty, the plea if offered *shall* be accepted and a jury impaneled to decide the punishment, *i. e.,* death or life imprisonment;

3. The choice between life imprisonment and capital punishment may be left to the jury in *every* case—regardless of

---

[6]After *Jackson*, the North Carolina Legislature repealed the guilty plea authorization in its statute (which was much like our *non-vult* plea provision) and it is no longer possible to plead guilty to a capital charge. The United States Supreme Court dictum in *North Carolina v. Alford, supra,* 400 *U. S.* 25, 91 S. Ct. 160, 27 *L. Ed.* 2d 162, found no constitutional infirmity in the change. It did note however that "it seemingly remains possible for a person charged with a capital offense to plead guilty to a lesser charge." 400 *U. S.* at 27 n. 1, 39 n. 12, 91 S. Ct. at 162, 27 *L. Ed.* 2d at 165 n. 1, 172 n. 12.

how the defendant's guilt is determined. See, *United States v. Jackson, supra,* 390 *U. S.* at 582, 88 S. Ct. at 1216, 20 *L. Ed.* 2d at 147.

4. On a plea of guilty or *non vult* or a finding of guilt of first degree murder by a jury, the trial judge, as is the usual case in criminal matters, shall impose the sentence up to the maximum authorized by the statute.

5. The Court in *Jackson* referred to the "availability" of other unspecified alternatives. Presumably the Legislature would search them out.

It is important, I think, for the judiciary to refrain from interfering in important policy matters, such as continued existence of the death penalty. The *Forcella* decision was on solid ground in holding that if *Jackson* applied to our statutes only the *non-vult* plea should fall. Such a holding is simply an interpretation of State law and does not in any way involve a question of Federal Constitutional law. On matters of interpretation of State law the Federal courts have always regarded State courts' interpretations as paramount. This being so, it is difficult to understand how the majority of our Court now abandons the view adopted in *Forcella* that the *Jackson* decision required excision of the *non-vult* plea and not elimination of the death penalty from our statute. Nothing has happened since which justifies us in declaring that after the present death sentences have been reduced to life imprisonment, and the death penalty is barred as punishment for any homicide committed prior to the filing date of our judgment in this case, the homicide act with the *non-vult* provision excluded cannot be continued in operation—at least until the Legislature decides upon the course it wishes followed.