STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
EVALINE B. RAY, DEFENDANT-APPELLANT.

Argued June 2, 1964—Decided July 7, 1964.

*Mr. Jesse Moskowitz* argued the cause for defendant-appellant.

*Mr. Frank J. Ziobro,* Assistant Prosecutor, argued the cause for plaintiff-respondent (*Mr. James T. Tumulty,* Hudson County Prosecutor, attorney).

The opinion of the Court was delivered by
SCHETTINO, J.  Defendant, Evaline B. Ray, was indicted in two counts; the first, for murder, the second, for man-

slaughter of her husband, Burt R. Ray. She was convicted of murder in the second degree and sentenced to 10 to 15 years. Defendant appeals to us as of right. *R. R.* 1:2–1(c).

On August 4, 1962 defendant and her husband left their two children at the home of defendant's mother, and attended the afternoon wedding of Charlotte and Hugh Mendez in East Orange. The husband was a member of the wedding party. Following the wedding and reception, they attended further festivities at the bride's home.

The State introduced four witnesses who testified that there was trouble between the defendant and her husband at the party. Mrs. Hilda Williams, the bridegroom's sister, stated that defendant was crying, and that she heard defendant remark that the husband was "mean." Mrs. Flora J. Hammie, sister of the bride, said that defendant told her at the party that her husband had insulted her. The witness added that defendant was upset.

The bride and groom gave almost identical testimony as to an incident that occurred on a staircase, as they were coming down to leave for their honeymoon trip. They met the Rays on the stairway and Burt Ray handed them $10 as a wedding present. Defendant took an additional $10 from her husband's hands and gave it to the bride. The latter returned the additional $10 to Mr. Ray commenting that they [the Rays] could not afford to give $20. Both Mendezes testified that as Burt Ray was pocketing the money, defendant tried to push him down the stairs, saying to him, "I'll kill you. I'll kill you."

No one else testified to the staircase incident and defendant denied either threatening or pushing her husband.

Sometime around eleven o'clock the Rays left the wedding reception because defendant was not feeling well. Mrs. O'Bannon, the Rays' landlady, remembered that the Rays came home about 11:20 P. M. and that they were "talking loud." She recalled defendant's saying to Burt: "If you want to go out you can go home." Mrs. O'Bannon also testified that Burt Ray went upstairs, and that defendant

stopped in to say she had a nice time. She noted that defendant appeared to be "staggering" and that defendant was "going back and forward * * * hitting the wall."

This witness next recounted that after she had gone to sleep, defendant came down, woke her up, and asked her to come up to Rays' apartment because she had "stabbed" her husband. Upon arriving at Rays' apartment, she saw Mr. Ray on the couch with blood coming out of his chest and also saw defendant breathing into her husband's mouth. The witness noticed a knife on the couch when she entered but did not recall seeing any blood on it. At defendant's request Mrs. O'Bannon called the police who arrived in 10 or 15 minutes.

Three police officers testified that they found Mr. Ray unconscious, being held in a semi-upright position by his wife who was breathing into his mouth. Two of the officers stated that defendant told them words to the effect; "I didn't mean to cut him. Please don't let him die." The third testified that defendant told him of an argument between herself and her husband in the kitchen, that she took out a knife and that her husband ran into it.

An inspection of the premises by the police revealed blood only in the immediate vicinity of the living room couch where deceased was lying when they arrived on the scene. There was no knife on the couch. An investigation of the kitchen turned up two knives in a rack, one of which was wet. There was also water on the sink and on the floor near the sink. When confronted with the two knives, defendant pointed out the wet one as the death dealing instrument. Mrs. O'Bannon denied that she washed the knife or that she saw the defendant wash it.

Defendant gave the following account of the events of the fateful evening. Following the party, she and her husband drove home, arriving at the apartment about 12 o'clock. Her husband went into the living room, sat down and started reading a paper while the defendant went into the bedroom, undressed and made ready for bed. While she was in the

bedroom, the telephone rang and the defendant answered it in the kitchen (although she conceded there was also a telephone in the bedroom). She recognized the voice of Hilda Williams who, after asking defendant how she was feeling, requested to speak to Mr. Ray. Defendant called her husband to the kitchen telephone. Defendant went to her bedroom and listened in on the conversation on the bedroom telephone. She testified that Mrs. Williams tried to make a date with Mr. Ray but that he said he did not know if he could get away. At this point, defendant ran into the kitchen and confronted her husband with words to the effect: "What's the idea of playing me second fiddle?" Defendant said that her husband became upset and "told me why don't I mind my g–d business.", and that she became frightened of him because he had never before used profanity to her. He then said, "I'll fix you," and started towards her and "he looked very angry." She reached up, grabbed a knife from the rack, and held it in front of her, stating, "Don't come over here—stay away." She related:

"A. He kept coming.

Q. And what happened? A. I took my hand and I pushed him back.

Q. And what happened? A. As he got up on to the knife he stopped short.

Q. And then what happened? A. Then he backed back.

Q. Did he say anything? A. He said, 'You cut me.'

Q. And what did you say to him? A. I told him I didn't cut him. He walked into it hisself.

Q. And then what did he say? A. He backed back and I looked in his face and he got boiling mad. I never seen him that angry before.

Q. Then what did he do? A. He came running at me head first like an animal, like a bull or something like he was going to knock me down.

Q. And then what happened? A. Then he walked away, and he walked past me, went into the living room.

Q. Did you at any time move that knife that you were holding there? A. No, I had it in my hand.

Q. You never moved it? A. No."

Defendant testified she did not feel the blade going into her husband's body; nor could she recall what she did with the knife after the incident although she denied washing it.

On cross-examination, defendant demonstrated how she held the knife once she had removed it from the rack. Unfortunately, any description in the record falls far short of conveying an accurate picture of this significant detail in the case. However, the following was educed. Defendant held the knife in her right hand, "straight forward" and demonstrated that she held it "below the shoulder" or "around the level of her breast" and "she held the knife with the thumb up and then changed it to the thumb down."

After the above described incident, Mr. Ray left the kitchen, went into the living room, hollering and clutching his chest, and sat on the couch. She went in and asked if he was all right. She then saw the blood, and proceeded to call the police and ambulance in the kitchen before running downstairs to enlist Mrs. O'Bannon's aid. Upon returning, defendant noticed her husband was turning white and losing breath, so she began breathing into his mouth and was doing this when the police came.

Defendant recalled she was in her "stocking feet" and her husband had shoes on at the time of this knife incident. She estimated her height to be five feet seven and a half inches, and her husband's to be about six feet three inches with shoes.

Defendant initially contends that the trial judge's frequent intervention in the proceedings was improper and resulted in depriving her of a fair trial. Particular emphasis is placed on the judge's interrogation of defendant and her witness, which, it is claimed, substantially prejudiced her cause. We agree with defendant that the trial judge's conduct, considered in the light of the specific circumstances of this case, constituted reversible error.

Concededly, in our State the trial judge "may and indeed in some instances should intervene" in the trial of a case. *State v. Guido*, 40 *N. J.* 191, 207 (1963). Hence,

in a rape case we held that the trial judge properly questioned the prosecutrix at length where it appeared that her mental anguish called for his intercession. *State v. Riley,* 28 *N. J.* 188, 200–205 (1958), appeal dismissed and *cert.* denied 359 *U. S.* 313, 79 *S. Ct.* 891, 3 *L. Ed. 2d* 832 (1959); *cert.* denied 361 *U. S.* 879, 80 *S. Ct.* 166, 4 *L. Ed. 2d* 117 (1959).

While the trial judge possesses a broad discretion as to his participation in a trial, "[b]alanced against this power * * * must be the necessity of judicial self-restraint and the maintenance of an atmosphere of impartiality." *Band's Refuse Removal, Inc. v. Fair Lawn Borough,* 62 *N. J. Super.* 522, 548 (*App. Div.* 1960), certification denied 33 *N. J.* 387 (1960). A judge must be careful not to throw his judicial weight on the side of either the State or the defendant, *People v. Mahoney,* 201 *Cal.* 618, 258 *P.* 607 (*Sup. Ct.* 1927), nor may he cross that "line that separates advocacy from impartiality." *Ridgewood v. Sreel Investment Corp.,* 28 *N. J.* 121, 132 (1958).

In *Guido,* Mr. Chief Justice Weintraub quoted with approval the following standard and caveat of *Canon* 15 of the *Canons of Judicial Ethics:*

" 'A judge may properly intervene in a trial of a case to promote expedition, and prevent unnecessary waste of time, or to clear up some obscurity, but he should bear in mind that his undue interference, impatience, or participation in the examination of witnesses, or a severe attitude on his part toward witnesses, especially those who are excited or terrified by the unusual circumstances of a trial, may tend to prevent the proper presentation of the cause, or the ascertainment of the truth in respect thereto.' " (at *p.* 207)

In this regard the Chief Justice warned:

"The trial judge is an imposing figure. To the jurors he is a symbol of experience, wisdom, and impartiality. If he so intervenes as to suggest disbelief, the impact upon the jurors may be critical. Hence in the usual case it is well to leave the primary burden of examination with counsel and to supplement their efforts, if necessary to clarify the scene, in a way which will lead the jurors to believe the objective is their better understanding." (at *p.* 208)

Improper conduct by the trial judge substantially prejudicing a party has resulted in reversal. In *Band's Refuse Removal, supra,* 62 *N. J. Super.* 522, the Appellate Division reversed, holding that the trial judge, no matter how sincerely motivated, may not by participation in the case convert civil litigation into a municipal investigation. In *State v. Corbo,* 32 *N. J.* 273 (1960), defense counsel raised a question as to the competency of a key eight-year-old witness to testify. Despite the fact that the trial judge was aware that the child had substantially altered her previous statements as to the facts in issue, the trial judge stated in the jury's presence that he did not know of any child who would not tell the truth after he had been indoctrinated on the issue of sin as part of certain religious training. We held that such a comment was prejudicial and was not overcome by general instructions outlining the jurors' exclusive role as triers of the facts. Again, in *State v. Guido, supra* (at *p.* 208), while reversing on other grounds, portions of the transcript were cited where the trial judge "intervened unnecessarily and in a way that could prejudice the jury's approach to the factual issues."

Defendant lists numerous instances of intervention by the trial judge which she claims exceeded the bounds of propriety and worked to her detriment. Initially, we would point out that the present case represents an instance where the trial judge should have been especially careful with regard to his questioning of the defendant and her chief witness—a doctor. The State's case rested on circumstantial evidence, and the conviction of defendant primarily and necessarily depended on the jury's disbelieving her account of the events on the evening in question. Not only was her credibility crucial but so too was that of her medical witness who substantiated her story of the killing by opining that it was the only possible way medically that the fatal wound could have occurred. *Cf. Groce v. Seder,* 267 *F. 2d* 352 (3 *Cir.* 1959).

With the foregoing in mind we proceed to those intrusions by the trial judge which we have found to constitute a misuse of discretion and which quite possibly influenced the jury in its determination of the factual issue of credibility.

The trial judge's lengthy questioning of defendant's key witness, Dr. Levitov, clearly reflects his incredulity as to the doctor's testimony. Essentially the doctor testified that the deceased was killed in the manner which defendant had described. This witness was given a hypothetical question embodying the pertinent portions of the testimony of defendant and the State's doctor who had performed the autopsy. Considering principally the angle of the incision, he opined that medically, by a process of elimination, the only way the wound could have been inflicted was as related by defendant. Our reading of the testimony, hampered by its failure to convey an accurate depiction of the visual demonstrations by the witness, leaves us suspect as to its probative value. However, this was for the jury to decide. In the presence of the jury the following sequence of questions by the trial judge mirrors both his disbelief as well as his ridicule, neither of which could have escaped the jury.

THE COURT: Am I to understand, doctor, that you state that you are able to tell us exactly how the knive entered the body of the deceased?

THE WITNESS: Yes, sir.

THE COURT: From the hypothetical question?

THE WITNESS: Yes, sir.

THE COURT: Doctor, so that the jury is fully advised as to your qualifications, you are not a prognosticator of any kind, are you?

MR. MOSKOWITZ: Obviously he is not.

THE COURT: I want this put in the record.

MR. MOSKOWITZ: I object.

THE COURT: Are you a prognosticator?

THE WITNESS: No, sir.

THE COURT: Have you studied any occult powers of any kind?

THE WITNESS: No, sir.

THE COURT: You are able to tell us this without ever viewing the body?

THE WITNESS: Yes, sir.

THE COURT: Without having seen this happen?

THE WITNESS: That's right, sir.

THE COURT: Strictly from the facts as presented by Mr. Moskowitz?
THE WITNESS: Yes, sir."

The defense counsel strenuously objected to the judge's lengthy interrogation of this witness as a violation of *Canon* 15. Moreover, here unlike *Guido,* we do not have the "trial judge's repeated assurances to the jury that he was acting in the interest of justice with no purpose of aiding or hurting the prosecution or defense." (at p. 208.) Instead the trial judge remarked:

"* * * I overrule your objection. And if you want further exposition on my position read [cite], in which case, * * *, I think I examined the witness more than the Prosecutor did, and I was sustained by the Appellate Division."

Furthermore, we find that certain of the trial judge's frequent interrogation of defendant improperly suggested his doubts as to her credibility. While the trial judge's questioning of defendant for the most part stayed within permissible bounds, on several occasions the record reflects an unnecessarily severe attitude on his part as evidenced by the following:

"THE WITNESS: I don't know how my hand was.
THE COURT: We want you to stop and think. It is important that you tell us, because you were there.
MR. MOSKOWITZ: If the witness doesn't know—
THE COURT: Just a moment. The witness was there. The witness should know.
MR. MOSKOWITZ: That doesn't mean that she should know, if your Honor pleases.
THE COURT: There is a difference between not knowing and not remembering, Mr. Moskowitz. She never at any time said she didn't remember. When she says she doesn't know, it is inconsistent with the fact she was there.
\*  *  *  *  *  *  *  *
THE COURT: Then you don't know how you held it right now, do you? Isn't that a fact?
THE WITNESS: I held it straight forward, your Honor.
THE COURT: You held it straight forward, but you don't know exactly whether you held it this way or whether you held it this way?

MR. MOSKOWITZ: If your Honor please—
THE WITNESS: This way.

\*      \*      \*      \*      \*      \*      \*      \*

THE COURT: Now, would you please explain to this Court and this jury how the two marks, as described by the doctor who performed the autopsy, happened to be within a short distance of one another if he approached you in the manner in which you described?
THE WITNESS: I don't know."

In our opinion, this questioning could have led the jury to believe that the judge doubted the veracity of defendant's story.

The trial judge also improperly created doubts as to the validity of defendant's marriage to Burt Ray. On direct examination, defendant admitted that she had an illegitimate child at the time of her marriage to decedent.

While the State made no issue as to the validity of her marriage to Burt Ray, the trial judge raised the issue on his own, and with it the necessary implications as to defendant's character. The trial judge commenced this line of questioning with defendant's sister and pursued it with Evaline Ray's father and mother in that order. The trial judge's course finally contaminated the prosecution who asked the mother the same questions about defendant's marriage. Defense counsel finally objected and the prosecutor admitted that he had no "legal evidence" of invalidity. At this point, the judge ruled that defendant and deceased were married as far as he and the jury were concerned. While this final concession might have cured the harm flowing to defendant by reason of the doubt cast on the marriage, the trial judge's raising of the issue was entirely improper and unnecessarily spotlighted for the jury defendant's prior sexual indiscretion. See footnote 2, in *Guido, supra,* 40 *N. J.,* at *pp.* 208–9.

In a final analysis, the above improprieties must be viewed collectively. Together they combine to portray the entire trial atmosphere which the trial judge in a very large part created. True, defense counsel was argumentative, at times to an extreme, and understandedly his conduct caused

considerable annoyance to the trial judge. Nonetheless, we feel that the trial judge's conduct deprived the defendant of a fair trial (*State v. Orecchio*, 16 *N. J.* 125, 129 (1954)), and requires a reversal and a remand for a new trial.

Defendant has pointed up other alleged trial errors which, because of the remand, require our views.

Defendant contends that the trial judge committed reversible error in refusing defendant's following requests to charge on circumstantial evidence and also in his charge on that subject:

> "In a case based on circumstantial evidence such as this, our law holds that you, the jury, must find this defendant not guilty of either of these charges against her if you find that the proofs of the State 'reasonably and fairly' make for a hypothesis of innocence, even though an inference of guilt is also possible. Now, therefore, after considering all of the evidence introduced by the State together with the evidence presented by the defendant, you conclude, bearing in mind the State's burden of proving all of the essential elements of its case, to your satisfaction beyond a reasonable doubt as I have defined reasonable doubt to you, that the proofs reasonably and fairly make for a hypothesis of innocence, you must acquit this defendant even though an inference of guilt is also possible.
>
> The circumstantial evidence presented to you must not alone be consistent with the defendant's guilt but must exclude every reasonable hypothesis of innocence for you to find this defendant guilty in this case.
>
> The rule as to a case based on circumstantial evidence has also been expressed to the effect that in such a case, you, the jury, must find the circumstances of the case to exclude to a moral certainty every other hypothesis but the single one of guilty and unless you can you must find this defendant not guilty."

The trial judge was correct in rejecting these requests. In *State v. Fiorello*, 36 *N. J.* 80, 87–8 (1961), Mr. Justice Jacobs stated:

> "* * * in *State v. Donohue*, 2 *N. J.* 381, 390 (1949), the court expressed the sweeping view that where the State's evidence is circumstantial, 'all of the circumstances not only must concur to indicate a defendant's guilt but they must also be inconsistent with any other rational conclusion,' and they must exclude 'every other hypothesis except that of guilt.' Although this broad expression has been occasionally restated it has not been applied literally; if it were it

would have unreasonably defeated many legitimate prosecutions based on circumstantial evidence where it was possible 'to devise speculative hypotheses consistent with defendant's innocence.' See *People v. Sullivan*, 22 *Ill. 2d* 122, 174 *N. E. 2d* 860, 861 (1961). The formulation found in *Donohue* has been effectively criticized elsewhere."

And in the footnote Mr. Justice Jacobs said (at *p.* 88):

"In [*State v. Bulna*, 46 *N. J. Super.* 313, 317–8 (*App. Div.* 1957), affirmed, 27 *N. J.* 93 (1958)], the court suggested that the *Donohue* formula may be a proper one for application by the jury. However, we consider the better approach to be that taken in *Holland v. United States*, 348 *U. S.* 121, 75 *S. Ct.* 127, 99 *L. Ed.* 150 (1954), where the court sustained a trial judge's refusal to instruct that where the government's evidence is circumstantial it must be such as to exclude every reasonable hypothesis other than that of guilt; after noting that where the jury is properly instructed on standards for reasonable doubt, such additional instruction on circumstantial evidence may be confusing, Justice Clark had this to say:
'Circumstantial evidence in this respect is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities. If the jury is convinced beyond a reasonable doubt, we can require no more.' 348 *U. S.*, at *p.* 140, 75 *S. Ct.*, at *p.* 137, 99 *L. Ed.*, at *pp.* 166–167."

We reiterate these views for emphasis and in the hope that they will not continue to escape the notice of some of the trial attorneys in this field.

However, defendant complains also of the charge as given on circumstantial evidence. We disagree with defendant's contention and hold that this charge did not constitute reversible error. The trial judge correctly informed the jury that the test in weighing circumstantial evidence to determine if guilt exists is the same as in the case of direct or testimonial evidence, namely, whether it is sufficient to generate a belief of guilt beyond a reasonable doubt. *Fiorello, supra; State v. Papitsas*, 80 *N. J. Super.* 420, 424 (*App. Div.* 1963).

Defendant also contends that the trial judge erred in refusing defendant the opportunity to use a human anatomy chart consisting of a schematic drawing of the normal part of the anatomy wherein decedent was wounded. Defendant argues that during the course of the testimony of defendant's medical expert, defendant's counsel, in order to enable the jury to better follow the doctor's testimony, attempted to have the doctor illustrate his testimony by the use of "Bender's Anatomy Charts," consisting of schematic drawings of the normal anatomy, specially created for courtroom use; that these charts, as represented to the trial judge, were anatomically accurate depictions of the human anatomy drawn by medical illustrations and their use for such demonstrations has been uniformly approved, citing, among other authorities, *Cavallaro v. Welch*, 138 *Conn.* 331, 84 *A. 2d* 279 (*Sup. Ct. Err.* 1951) (chart of human head); *Berry v. Harmon*, 329 *S. W. 2d* 784, 793 (*Mo. Sup. Ct.* 1959) (normal electroencephalogram); *Dabareiner v. Weisflog*, 253 *Wisc.* 23, 33 *N. W. 2d* 220, 223 (*Sup. Ct.* 1948) (charts of human pelvis); *Traders & General Ins. Co. v. Stone*, 258 *S. W. 2d* 409–411 (*Tex. Civ. App.* 1953) (spine of human skeleten and a chart of the human body). Defendant also urges that when the trial judge prohibited their use, he wrongfully deprived defendant of a proper opportunity to effectively maintain her defense.

We have not seen the charts and therefore cannot tell whether the trial judge erred in rejecting their use. We assume that if charts will aid the jury, sound exercise of discretion would allow their use.

Defendant urges as another ground for reversal the action of the trial judge in permitting the State to put into evidence three photographs of the Rays' living room depicting therein a couch with the alleged murder weapon, the knife, thereon. (Two other photographs of the same scene without the knife were admitted in evidence without objection.) Admittedly, before the three pictures were taken, the knife was placed

on the couch by one of the policemen who did not see it on the couch at any time before he put it there.

Defendant concedes that the admission of photographs into evidence is ordinarily within the discretion of the trial judge, that his decision will not ordinarily be disturbed unless there is a marked abuse of discretion, and that photographs depicting the scene of the occurrence are properly admissible. *State v. Wise,* 19 *N. J.* 59, 98 (1955); see also III *Wigmore on Evidence, secs.* 792, 798 (*3d ed.* 1940), and 11 *New Jersey Digest, Evidence, sec.* 359, *pp.* 507 *et seq.* However, defendant claims that the "posed" knife on the couch improperly bolstered the State's suggestion that the stabbing of Mr. Ray took place while he was on the couch and not in the kitchen as defendant insisted.

██ Ordinarily, a trial judge should not permit posed pictures which simply portray a scene which has been arranged to support a testimonial contention which the profferor seeks to advance. If urgent necessity is shown, the trial judge may, in the proper exercise of discretion, admit the photographs. Here, we find no such necessity. As a caveat, we are not here considering a photograph taken of a defendant in a criminal case while he is re-enacting some scene involved in the crime with which he is charged.

Reversed and remanded for a new trial.

*For reversal* — Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For affirmance*—None.