211 N.J. Super. 544 (1986)
512 A.2d 500
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
HUMPHREY COHEN, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted May 19, 1986.
Decided May 28, 1986.
*546 Before Judges MORTON I. GREENBERG, LONG and HAVEY.
Thomas S. Smith, Jr., Acting Public Defender, attorney for appellant (John F. Richardson, Designated Attorney, of counsel and on the brief).
W. Cary Edwards, Attorney General, attorney for respondent (Steven Pasternak, Deputy Attorney General, of counsel and on the brief).
The opinion of the court was delivered by MORTON I. GREENBERG, P.J.A.D.
This matter comes on before this court on appeal from a judgment of conviction and the sentences entered thereon in this criminal case. Defendant, through his attorney and pro se, advances various grounds for relief including a contention that notwithstanding the fact he was not sentenced to die, the death qualification of the jury infringed upon his rights to a fair and impartial jury under both the federal and state constitutions. While this court is aware that similar challenges have been made in other cases in New Jersey, it appears that no appellate court in this State has ruled upon the validity of the death qualification process after the death penalty was restored by L. 1982, c. 111.
The case originated when defendant, Donald Wilson and Robert Davis were indicted for offenses arising from the murder and robbery of Otha Thompson in Newark on January 26, 1983. All three men were charged with felony murder, N.J.S.A. 2C:11-3(a)(3) (count one); first degree armed robbery, *547 N.J.S.A. 2C:15-1 (count three); and unlawful possession of a firearm, N.J.S.A. 2C:39-5(b) (count four). In addition defendant alone was charged in count two with a purposeful or knowing murder, N.J.S.A. 2C:11-3(a)(1), (2). Defendant pleaded not guilty to all charges.
On January 30, 1984, the trial court denied a pretrial motion by defendant to prevent death qualification of jurors. Thereafter defendant, in a jury trial in which he was the only defendant, was found guilty on all counts. At a subsequent sentencing proceeding the death penalty was eliminated as a possible punishment. See N.J.S.A. 2C:11-3c(3). Thereafter, defendant was sentenced as follows: the conviction on count one for felony murder was merged into the conviction on count two for purposeful or knowing murder and the conviction on count four for unlawful possession of a weapon was merged into the first degree robbery conviction on count three. On count two defendant was sentenced to life imprisonment with a 30 year period of parole disqualification. On count three he was sentenced to a consecutive term of 15 years with a seven and one-half year period of parole disqualification. In addition, penalties of $500 and $200 were imposed on counts two and three, respectively, for the use of the Violent Crimes Compensation Board.
Defendant has appealed, raising the following contentions through his attorney:
(1) The process of death qualification in the present case deprived the defendant of his right to a fair and impartial jury as guaranteed by the federal and state constitutions.
A. Introduction.
B. An analysis of the death qualification process.
C. The factual circumstances of the present case.
1. Death qualification and juror attitudes.
2. Death qualification and juror behavior.
3. The process of death qualification.
D. The death qualification procedures denied to the defendant his right to a jury drawn from a fair representative cross-section of the community.

*548 E. The State's use of death qualification procedures to exclude impartial jurors at the guilt/innocence phase of the defendant's capital trial denied to him his right to a fair and impartial trial.
F. The defendant's Eighth Amendment interest in a reliable fact-finding process which is reflective of contemporary community values was violated by the death qualification process.
G. The death qualification process requiring each potential juror to express their ability to return a death sentence before deciding guilt or innocence denied to the defendant his right to an impartial jury and a fair trial.
H. The decision of the jury not to impose the death penalty upon the defendant does not in any way impair the arguments raised with respect to the death qualification process.
I. Conclusion.
(2) The trial court's independent questioning of several key State witnesses improperly cast itself into the role of an advocate.
(3) The prosecutor's summation was improper by personally attacking the defendant. (Not raised below)
(4) The sentence imposed was manifestly excessive.
In addition he has filed a pro se brief contending:
(1) Counsel for defendant was so grossly ineffective as to deprive defendant of his rights guaranteed by the U.S. Constitution and the Constitution of New Jersey. (a) failure to have indictment amended, (b) failure to call any of the witnesses that supported the theme of the defense, (c) the presentation of an expert witness, where information that was obtained during an examination was employed against the defendant.
(2) The initial arrest of the defendant was illegal, thus tainting the defendant's statement that followed the arrest.
The facts in the case are not complicated. At approximately 2:00 a.m. on January 26, 1983, Otha Thompson left the Chicken Shack restaurant on Clinton Avenue in Newark. As Thompson started to cross the street, defendant confronted him, kicking him and knocking him to the ground. Defendant then shot and wounded him. As Thompson struggled to get back on his feet and reach the sidewalk defendant again shot him. Thompson then fell to the sidewalk and defendant and his accomplices took his wallet and left. They later divided up the $40 or $50 proceeds from the wallet, defendant's share being approximately $10.
The police arrived shortly after the shooting, following which Thompson was taken to a hospital where he was pronounced dead. On the basis of a statement and consent given by Robert *549 Davis, the police recovered the weapon which had been hidden in Davis' basement. Defendant was later arrested and, after being given Miranda[1] warnings, made a statement to the police in which he confessed to shooting Thompson during the robbery.
Defendant's comprehensive contentions with respect to the death qualification process are traceable to the fact that subsequent to his pretrial motion to preclude such qualification the jurors were death qualified. As a consequence the jurors who made it clear that in no circumstances regardless of the evidence would they impose capital punishment were excused from all aspects of the trial including the initial determination of guilt or innocence. Defendant challenges this procedure under both the federal and state constitutions as, in his view, a death qualified jury is more likely to convict a defendant than a jury not so qualified.
Defendant's contention under the federal constitution is based largely on Grigsby v. Mabry, 758 F.2d 226 (8 Cir.1985). However, after his brief was filed, the Supreme Court of the United States in Lockhart v. McCree, ___ U.S. ___, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), reversed Grigsby and made it perfectly clear that, as a matter of federal constitutional law, death qualification is acceptable. In the circumstances we need not further consider the issue under federal law.
We recognize, of course, that defendant has also challenged the death qualification of the jury under the provisions of the New Jersey Constitution guaranteeing a defendant a trial before an "impartial jury." N.J. Const. (1947), Art. I, ¶ 10. We further acknowledge that the courts of this State, in addressing the state constitution, are not bound by decisions of the Supreme Court of the United States construing federal *550 constitutional provisions similar to those of the state constitution. See, e.g., State v. Bruzzese, 94 N.J. 210, 216 (1983), cert. den. 465 U.S. 1030, 104 S.Ct. 1295, 79 L.Ed.2d 695 (1984); State v. Alston, 88 N.J. 211, 226 (1981).
Nevertheless we are persuaded that we should follow Lockhart v. McCree, a conclusion we reach for several reasons. Firstly, we point out that ordinarily a determination by a state court not to follow the Supreme Court of the United States when the state court is construing a state constitutional provision does not imply that the state court thinks the Supreme Court wrongly decided the matter before it. To the contrary, it only reflects a state decision that persons within the state are entitled to "greater protection" than is afforded by the Supreme Court of the United States. See State v. Alston, supra, 88 N.J. at 226. Thus in State v. Alston the Supreme Court of New Jersey construed the New Jersey Constitution to afford certain defendants standing to move to suppress the fruits of a search even though they would not have had standing under federal law. Similarly, in State v. Novembrino, 200 N.J. Super. 229 (App.Div. 1985), leave to app. granted 101 N.J. 305 (1985), we declined to follow the Supreme Court of the United States in allowing a good faith exception to the exclusionary rule, a result we reached essentially on several policy grounds "[t]he most compelling" of which was "to protect the integrity of our State criminal trials." Id. at 244. Obviously these divergent federal and New Jersey views of the exclusionary rule simply reflect the different conclusions of the courts when weighing the rights of individuals and the integrity of the judicial process against the importance of obtaining competent evidence. In those circumstances it cannot reasonably be said that one court in reaching its result was wrong.
But if we do not follow Lockhart v. McCree we will not reasonably be able to avoid implying that we think the Supreme Court of the United States wrongly decided that case. We so *551 conclude because that court considered at length and rejected the suggestion that death qualifying a jury violated a defendant's right to an impartial jury, 106 S.Ct. at 1766-1771, the same right asserted by defendant under N.J. Const. (1947), Art. I, ¶ 10. We think that a jury and the process by which it is selected is either impartial or not regardless of whether the matter is viewed from the perspective of federal or state law. Thus to say that the process here was not impartial is necessarily to say that Lockhart v. McCree was wrongly decided. We think that a state court, particularly a court not of last resort, should not say the Supreme Court of the United States incorrectly decided a case.
The second reason we follow Lockhart v. McCree is that we find it consistent with precedent under New Jersey law. This very point was recognized after the readoption of the death penalty by L. 1982, c. 111, by Judge Stern in State v. Bass, 189 N.J. Super. 461, 467 (Law Div. 1983), when he said:
The New Jersey Supreme Court has previously permitted `death qualification' in trials where penalty was simultaneously considered by the same jury which determined guilt. No reason appears to change that policy in this State because of the bifurcated proceeding. See e.g., State v. Forcella, 52 N.J. 263, 290-293 (1968) rev. sub nom. Funicello v. New Jersey, 403 U.S. 948, 91 S.Ct. 2278, 29 L.Ed.2d 859 (1971); State v. Funicello, 60 N.J. 60, 65 (1972), cert. den. sub nom. New Jersey v. Presha, 408 U.S. 942, 92 S.Ct. 2849, 33 L.Ed.2d 766 (1972). See, also, State v. Mathis, supra, 52 N.J. [238] at 242 N.J.S.A. 2A:113-4.
While we recognize that the opinions of the Supreme Court of New Jersey were rendered under prior statutory law, this point does not seem controlling for the court reached its result under our present constitution.
Thirdly, we note that even if we assumed that a death qualified jury is more likely to convict than a jury not so qualified, it does not follow that a defendant is prejudiced by the death qualification process. Death qualification under our statute will undoubtedly result in the exclusion of jurors who would always vote for death in a case of purposeful or knowing *552 murder. Indeed, the attorney general concedes as much, for in his brief he states: "The State views both groups of prospective jurors, those who would automatically impose capital punishment and those who are unalterably opposed to capital punishment, as being unable to follow the law and thus views both groups subject to exclusion from the petit panel." While it may well be that far fewer jurors will automatically favor the death penalty in all potential capital murder cases than will oppose it in any such case, see Adams v. Texas, 448 U.S. 38, 49, 100 S.Ct. 2521, 2528, 65 L.Ed.2d 581, 592 (1980), the fact remains that if there is any merit in defendant's concern that exclusion of jurors who would never impose the death penalty is prejudicial to him, it follows that exclusion of those who automatically insist upon it in a potential capital case would benefit him. In fact, of course, we think that exclusion of both groups of jurors will further the goal of selecting a jury that is impartial on all the issues that it may face.
Defendant's contention with respect to the questioning of witnesses by the court relates to the judge's interrogation of Glen Capers, an eyewitness called by the State, who was 16 years old when he testified, and Dr. Milton Melczer, the physician who performed the autopsy on Thompson. Defendant asserts the questioning was prejudicial to him.
It is well recognized that although such participation must not exceed the bounds of judicial propriety, a trial judge may question witnesses. Troast v. Lascari, 59 N.J. Super. 110, 117 (App.Div. 1960); Lawton v. Virginia Stevedoring Co., 50 N.J. Super. 564, 580 (App.Div. 1958). In this regard the judge possesses broad discretion, State v. Ray, 43 N.J. 19, 25 (1964), and may question a witness to clarify existing testimony or to elicit facts material to the trial. State v. Riley, 28 N.J. 188, 200 (1958), cert. den. 359 U.S. 313, 79 S.Ct. 891, 3 L.Ed.2d 832 (1959); Ridgewood v. Sreel Investment Corp., 28 N.J. 121, 132 *553 (1958). We recognize, however, the judge must exercise his power to participate actively in a trial with great restraint and with an effort to maintain an atmosphere of impartiality, particularly in a jury trial. See State v. Ray, supra, 43 N.J. at 25; Band's Refuse Removal, Inc. v. Fair Lawn Bor., 62 N.J. Super. 522, 548 (App.Div. 1960), certif. den. 33 N.J. 387 (1960).
Here there was great confusion in Capers' testimony. He had given inconsistent statements before the trial and his testimony in court was not consistent in itself. Ultimately the judge intervened with questioning that was completely neutral. The judge did not demean or disparage Capers nor intimate that he was lacking in credibility. See State v. Chaney, 160 N.J. Super. 49, 69-70 (App.Div. 1978), certif. den. 78 N.J. 405 (1978), cert. den. 440 U.S. 922, 99 S.Ct. 1250, 59 L.Ed.2d 475 (1979); State v. Kelly, 118 N.J. Super. 38, 52 (App.Div. 1972), certif. den. 60 N.J. 350 (1972). Rather the judge succeeded in helping a young witness with his testimony by getting him to state clearly his perception of the incident and later events, thus promoting the jury's understanding of the matter. Accordingly, the court did not become a participant on behalf of the prosecution, but merely assisted the jury in the search for truth. State v. Ross, 80 N.J. 239, 249-250 (1979).
The questioning by the court of Melczer dealt with Thompson's death after the shooting and his physical characteristics and medical condition. Inasmuch as there is no question but that Thompson was shot and killed the questioning was harmless.
We have carefully examined defendant's remaining contentions and find they are clearly without merit. R. 2:11-3(e)(2). We simply note that inasmuch as it appears, as defendant admits in his pro se brief, he was on his way to the police station to turn himself in for the Thompson homicide when he *554 was arrested, it would be extraordinary to suppress his later statement on the ground that his arrest was illegal.
Affirmed.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).