213 N.J. Super. 426 (1986)
517 A.2d 513
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
DANIEL MARTIN, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued September 17, 1986.
Decided November 10, 1986.
*428 Before Judges FURMAN, DREIER and STERN.
Joel C. Seltzer, designated counsel, argued the cause on behalf of appellant (Alfred A. Slocum, Public Defender, attorney).
Robert Bonpietro, Deputy Attorney General, argued the cause on behalf of respondent (W. Cary Edwards, Attorney General, attorney).
The opinion of the court was delivered by STERN, J.A.D.
Tried by a jury, defendant was convicted of purposeful or knowing murder, contrary to N.J.S.A. 2C:11-3a(1), (2) (count one); felony murder, contrary to N.J.S.A. 2C:11-3a(3) (count two); aggravated arson, contrary to N.J.S.A. 2C:17-1a (count three); and arson, contrary to N.J.S.A. 2C:17-1b (count four). As the alleged murder occurred on June 29, 1983, the trial proceeded as a capital case. See N.J.S.A. 2C:11-3b, -3c. The jury concluded that the death penalty was not warranted, and defendant was sentenced on the purposeful or knowing murder conviction to life imprisonment with a mandatory 30 years of parole ineligibility. Defendant was also sentenced to a concurrent ten year custodial term, with five years of parole ineligibility, on the aggravated arson conviction. The felony murder conviction was merged into the purposeful or knowing murder, and the arson conviction was merged into the aggravated arson. Defendant appeals and argues:
POINT I THE COURT COMMITTED REVERSIBLE ERROR IN FAILING TO DISMISS COUNT I OF THE INDICTMENT CHARGING THE DEFENDANT WITH KNOWING AND PURPOSELY COMMITTED MURDER IN VIOLATION OF 2C:11-3.
POINT II PREJUDICIAL ERROR WAS CREATED IN THE COURTS CHARGE TO THE JURY REQUIRING THEM TO FIND SEVERE INTOXICATION BEFORE INTOXICATION DEFENSE COULD BE FOUND, AND IN THE ALTERNATIVE, THE JUDGMENT WAS AGAINST THE WEIGHT OF THE EVIDENCE.
POINT III DEFENDANT'S SENTENCE TO A MINIMUM TERM OF 30 YEARS AS `REQUIRED' BY N.J.S.A. 2C:11-3(b) WAS AN ABUSE OF DISCRETION BY THE TRIAL JUDGE, AND IN THE ALTERNATIVE AN UNCONSTITUTIONAL DEPRIVATION OF HIS RIGHTS CONTRARY TO THE NEW JERSEY CONSTITUTION, ARTICLE 1, PARAGRAPH 12.

*429 POINT IV THE STATE FAILED TO MEET ITS HEAVY BURDEN WITH RESPECT TO DEFENDANT MARTIN'S INTELLIGENT WAIVER OF HIS MIRANDA RIGHTS.
POINT V COURT'S REMOVAL OF JUROR FOR CAUSE WHO EXPRESSED GOOD FAITH EMOTIONAL CONCERNS AS TO IMPOSITION OF DEATH PENALTY VIOLATED DEFENDANTS 6th AND 14th AMENDMENT RIGHTS.
A recital of the facts is required in order to understand the first contention.
Shortly before midnight on June 29, 1983, defendant Daniel Louis Martin started a fire at an apartment located at 69 Church Street in Keansburg. The fire was commenced after defendant and some friends were asked to leave a party being given at the apartment by the hostess Lois Baker. The fire quickly consumed the building and caused the death of Barbara Quartz.
Defendant went to the party with five others from Keyport including Paul Wade and "a girl named Tracy," a juvenile 13 or 14 years of age. According to one attendee, "[W]hen everybody walked in I was a little shocked to see Danny there because him and Lois didn't get along from the beginning."
The group arrived at the party between 8:30 and 10:00 p.m. Subsequently, an argument broke out between Wade and one of the other guests, Mike Fitzpatrick. The argument concerned some comments or actions Wade directed towards Fitzpatrick's girlfriend, Barbara Quartz. The argument between the two broke into a wrestling match which was broken up by the other guests. Ms. Baker then asked Fitzpatrick to leave, which he did, and the party continued. Shortly thereafter, an argument erupted between Baker and Wade. According to Baker, "I was arguing with Paul Wade because he brought a 13-year old girl up to my house and I don't want drinking in my house and I asked him to either tell her to stop drinking or leave." Baker continued, "Well, he didn't do it, so I decided to tell them all to leave." Thus, "[e]verybody who came in the car from Keyport" was asked to leave.
It was agreed to by all the witnesses, including Ms. Baker, that defendant was not himself involved in any arguments with *430 anyone either during the party or after the group was asked to leave. Defendant left the apartment with Wade.
According to defendant, as he and Wade left the apartment, they vandalized what they thought was Fitzpatrick's motorcycle which was parked outside. They flattened the tires, slashed the seat and removed the mirrors. Defendant then took the mirrors and carried them back up the stairs to the Baker apartment and placed them outside the front door, apparently for Ms. Baker to find.
According to defendant,
When I was walking down the steps, before I walked down the steps I got outside. Everybody was left except me and Paul Wade left and walked down the steps, and it was a paper bag by the  in the hallway, somewhere in the hallway, I think by Lois Baker's door. I picked up the bag and I walked down the steps with it. I was just, you know, throwing it around making a mess, you know, and I set it down and I lit up a cigarette. And the match  I lit the paper bag on fire, you know, 'cause I thought maybe it would burn up the garbage, you know, not to spread or anything, just make, like make a mess of the bottom of the landing. And then, then I left.
Defendant subsequently admitted that he didn't endeavor to put the fire out because "I thought it would go out. It was only the paper bag."
Defendant then left the scene. As he entered a waiting car, he told his friends that he "lit a fire." Defendant made a similar admission during the police investigation.
The fire started by defendant burned with intensity. There was no contest at trial that Barbara Quartz, who had been drinking prior to falling asleep on the living room floor of the Baker apartment, was unable to escape the blaze and died in the fire.
Investigator Frederick Dispensiere of the Monmouth County Prosecutor's Office conducted an investigation of the fire and concluded that it was deliberately set at some point between the ground floor and second floor. He also suspected that an accelerant had been used and sent wood samples from the fire site to the State Police laboratory to test for the presence of *431 volatiles. Gas chromotography tests performed on these wood samples revealed the presence of kerosene.
The investigator also testified that he had found what he believed were "pour patterns," which indicated the use of an accelerant, on the stairway between the first and second levels of the building which had "masonry construction" on the first floor and "wood-framed construction" on the upper levels. Thus, the investigator concluded that the fire was set "[i]n the stairwell between the ground floor and Level Two" and that it "was deliberately set." According to the investigator:
I formed that opinion on again examination of the scene in detail, interviews of the responding fire fighters, police officers and witnesses, occupants and also through the systematic elimination of everything in the building which could have accidentally or naturally caused the fire.
He also concluded that an accelerant was used
... based on several factors: The degree of damage in the hallway, the absence of anything in that hallway combustible which could have created that much of a volume of fire, the depth of char, the rate at which the fire spread and the direction that it spread also.
"Pour patterns" were also found by Daniel Slowick, an expert hired by the building owner's insurance carrier, who testified for the State. According to Slowick, "it was a deliberately set fire" with its origin "in the stairwell" at a point which could not be precisely determined. He concluded that "it was apparent that there had been an accelerated fire in the building" and that a "flammable or combustible liquid" had been used to accelerate the fire. Another expert for the State, Stephen Andrews of the New Jersey State Police laboratory concluded, based on evaluation of damaged items from the fire, that "the volutiles [sic] were characteristic of petroleum distillates, in this case similar to kerosene." Moreover, an analysis by Jimmy Pau, a chemist with the Mercury Research Laboratory, similarly revealed that kerosene had been used in the fire.
Ms. Baker testified that prior to the fire, a friend had purchased a half gallon of kerosene for her, which she used to treat her children's lice problem. She stored what remained of *432 the kerosene in a plastic milk container which she hid from her children in a corner of the hallway outside her apartment.
On July 6, 1983 Investigator Dispensiere returned to the apartment building and discovered a melted, plastic container, believed to be a Clorox bottle on the third floor stairwell landing of the building. This container the odor of a flammable liquid. Dispensiere stated that this container was not found either by himself or by the six or eight others who conducted the initial investigation. Dispensiere admitted that the container was not discovered until after Ms. Baker told the police about its existence.
Investigator Dispensiere also concluded that the door to the Baker apartment and the building's exterior door, leading to the outside from the bottom of the staircase, were open during the fire. According to defendant's expert, Ralph Snavely, the fact that the doors were open created a chimney effect resulting in a fire which spread quickly. Mr. Snavely also opined that the astroturf artifical carpeting, which covered the building's stairwell, had a petroleum rubber based backing which contributed to the spread of the fire. However, Mr. Slowick was of the view that astroturf burned slowly and was self-extinguishing.

I
In the trial court, at the end of the State's case, defendant moved for judgment of acquittal on the purposeful or knowing murder count. He argued that there was insufficient evidence to submit that charge to the jury. Defendant's motion was denied, and on this appeal he challenges that denial. Defendant contends that his actions cannot be deemed to constitute purposeful or knowing conduct sufficient to sustain a murder conviction.
"Murder" occurs when the actor "purposely" or "knowingly" "causes death or serious bodily injury resulting in death." N.J.S.A. 2C:11-3a(1), (2). N.J.S.A. 2C:2-2b(1) defines purposeful conduct:

*433 A person acts purposely with respect to the nature of his conduct or a result thereof if it is his conscious object to engage in conduct of that nature or to cause such a result. A person acts purposely with respect to attendant circumstances if he is aware of the existence of such circumstances or he believes or hopes that they exist. `With purpose,' `designed,' `with design' or equivalent terms have the same meaning.
N.J.S.A. 2C:2-2b(2) provides:
A person acts knowingly with respect to the nature of his conduct or the attendant circumstances if he is aware that his conduct is of that nature, or that such circumstances exist, or he is aware of a high probability of their existence. A person acts knowingly with respect to a result of his conduct if he is aware that it is practically certain that his conduct will cause such a result. `Knowing,' `with knowledge' or equivalent terms have the same meaning.
Defendant contends that given N.J.S.A. 2C:2-2b(2) it must be "practically certain" that his conduct will result in death. We disagree. A murder conviction based on "knowing" conduct can result from conduct which is practically certain to cause serious bodily injury when death is a result of the injury caused. See also N.J.S.A. 2C:2-3b. Similarly, a murder conviction based on "purposeful" conduct can result from the purposeful causing of serious bodily injury when death is a result of the injury caused.
Upon a motion for judgment of acquittal the State is entitled to all reasonable and legitimate inferences from the evidence for purposes of determining whether a reasonable jury could find defendant guilty beyond a reasonable doubt. See State v. Martinez, 97 N.J. 567, 571-572 (1984); State v. Reyes, 50 N.J. 454 (1967). As stated by our Supreme Court in State v. Martinez:
In State v. Reyes, 50 N.J. 454 (1967), we held that the test to be applied by the trial court in determining the sufficiency of the evidence is
whether, viewing the State's evidence in its entirety, be that evidence direct or circumstantial, and giving the State the benefit of all its favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom, a reasonable jury could find guilt of the charge beyond a reasonable doubt. [Id. 50 N.J. at 459].
This standard is consistent with the United States Supreme Court's opinion in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, reh. den., 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979). In that case, the Supreme Court stated that the appellate standard of reviewing the sufficiency of evidence to support a criminal conviction
must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a *434 finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to `ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.' Woodby v. INS, 385 U.S. [276] at 282, 17 L.Ed.2d 362, 87 S.Ct. 483 [486] (emphasis added). Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Johnson v. Louisiana, 406 U.S. [356] at 362, 32 L.Ed.2d 152, 92 S.Ct. 1620 [1624]. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. [Id. 443 U.S. at 318-19, 99 S.Ct. at 2789, 61 L.Ed.2d at 573].
[97 N.J. at 571-572].
Our analysis of the record is governed by the same standard irrespective of whether the evidence is circumstantial or direct, see State v. Mayberry, 52 N.J. 413, 437 (1968), cert. den. 393 U.S. 1043, 89 S.Ct. 673, 21 L.Ed.2d 593 (1969), and the veracity of each inference  including one related to culpability or intent  need not be established beyond a reasonable doubt in order for the jury to draw the inference. State v. Brown, 80 N.J. 587, 592 (1979); State v. DiRienzo, 53 N.J. 360, 376 (1969). Circumstantial evidence need not preclude every other hypothesis in order to establish guilt beyond a reasonable doubt. State v. Mayberry, supra, 52 N.J. at 436. See also State v. Smith, 210 N.J. Super. 43, 49 (App.Div. 1986).
The definition of purposeful and knowing conduct as embodied in the Code is that recommended by the Final Report of the New Jersey Criminal Law Revision Commission. As stated in the commentary to the Commission Report:
2. The approach of the Code is based on the view that it is necessary for clear analysis that the question of the kind of liability required to establish the commission of an offense be faced squarely with respect to each material element of the crime. See § 2C:1-13i. The answer may, of course, be the same in many cases as to each such element. This approach is in accord with the modern New Jersey cases. In a murder case the prosecution must normally prove an intent to kill or to cause grievous bodily harm to establish the required culpability with respect to the element of the crime involving the result of the defendant's conduct....
[II Final Report of the New Jersey Criminal Law Revision Commission (1971) at 40.[1]]
*435 The jury apparently rejected defendant's contention that no accelerant was used. It could well have found that defendant set the fire with an accelerant and did so with the requisite purposeful or knowing conduct so as to cause serious bodily injury which resulted in Ms. Quartz's death. The jury could have concluded that, having just been asked to leave the party by Ms. Baker, defendant set a fire on the stairwell leading to Ms. Baker's third floor apartment (or between her apartment and the first floor exit). Given the wooden structure, the number of people in the apartment and the fact that people including Ms. Quartz had been drinking therein, we cannot conclude that the reasonable inferences do not support a conviction of defendant for "purposely" or "knowingly" causing serious bodily injury which resulted in death.[2]
When defendant made his motion for judgment of acquittal at the end of the State's case, the trial judge denied the motion, stating:
What is a felony murder can also be a knowing or purposeful murder. It is clear to me that under those definitions of knowing and purposeful, again we are talking about whether a jury should pass upon this issue, whether there is sufficient evidence for a jury to pass upon the issue, it is clear to me that if the jury finds that the defendant specifically directed his fire at a group of people with the object in his mind, if you will, of causing serious bodily injury to those people, then it can in fact be knowing and purposeful  knowing or purposeful murder. If he directs his fire, just as he directs his gun or he directs his knife

*436 One, was it the object of what he was doing to cause serious bodily injury to that group of people upstairs? That's a jury question. I think there is sufficient proof to indicate that by means of the instrument used.
Two, did he direct his fire at those people? That's something the jury can decide by virtue of the fact that it happened right after he got thrown out of the place and came back and said he lit a fire.
This concept of knowledge, a person acts knowingly with respect to the result of his conduct if he is aware that it is practically certain that his conduct will cause that result.
In this Court's opinion from the testimony that I have heard a jury could clearly find that he acted knowingly when he set that fire, knowing that result was practically certain, his conduct in setting the fire would cause the result, that is serious bodily injury to someone, and it turned out to be death.
We keep talking about did he act with knowledge that he would cause death. Well, it's more than that. Did he act with knowledge that he would cause death or serious bodily injury to this identifiable victim or victims?
A jury could say that maybe he didn't want to cause the death, but by using the instrument that he did use and the manner in which he used it and with the requisite state of mind, that is, `I'm going to get those people,' if they find that that is so and the instrument used is a fire with accelerants involved in it, they could say, `Well, it is practically certain he must have acted with a certain knowledge and it is practically certain that lighting that thing would cause the result that did result, that is the death of that girl or certainly serious bodily injury to somebody.'
It is not necessary that the State presents sufficient evidence to show he wanted to cause death. They can also show he wanted to cause serious bodily injury which ended up resulting in death.
Whether or not it was serious bodily injury that he wanted to cause, those are jury questions. I think they are traditionally and inherently jury questions and I am going to present the issue to the jury and let them decide. They may find that is not what he had in mind. He may not have intended to do that. They may believe that he did not intend it. Well, that's for them to decide.[3]
We agree with the judge's analysis and affirm the purposeful or knowing murder conviction.

II
Defendant argues that the court's instructions on intoxication incorrectly state the law, that the court incorrectly allocated the burden of proof and, further, that the statute (N.J.S.A. 2C:2-8d) *437 unconstitutionally shifts the burden of proof to the defendant to prove intoxication by clear and convincing evidence. Defendant's own testimony was the basis for the intoxication "defense." He stated that he had "[a]bout four beers" at a friend's house before going to the party and "[a]bout three or four bottles of beer and a couple shots of Southern Comfort" while there.
N.J.S.A. 2C:2-8d was amended after the date of this offense. It now provides, as it did at the time of trial:
Intoxication which (1) is not self-induced or (2) is pathological is an affirmative defense if by reason of such intoxication the actor at the time of his conduct did not know the nature and quality of the act he was doing, or if he did know it, that he did not know what he was doing was wrong. Intoxication under this subsection must be proved by clear and convincing evidence.[4]
N.J.S.A. 2C:2-8d concerns pathological intoxication and is not applicable to this case which concerns, at the most, voluntary intoxication in the absence of proof of any pathological condition. See N.J.S.A. 2C:2-8b. Moreover, the court properly placed the burden on the State to disprove voluntary intoxication and to prove beyond a reasonable doubt that defendant acted "knowingly or purposely" in order to convict for an offense requiring purposeful or knowing conduct. See e.g., State v. Galiyano, 178 N.J. Super. 393 (App.Div. 1981), certif. den. 87 N.J. 424 (1981); State v. Murphy, 185 N.J. Super. 72, 74-75 (Law Div. 1982). See also State v. Polk, 78 N.J. 539, 540-541 (1979) (Pashman, J. concurring).[5] Furthermore, the jury was charged in terms of the distinction between purposeful or knowing conduct and reckless conduct, and was expressly advised that voluntary intoxication excused purposeful or knowing culpability, but not reckless conduct. As pointed out in State v. Stasio, 78 N.J. 467, 482 (1979), intoxication "could *438 reduce murder to manslaughter" because of N.J.S.A. 2C:2-8b which provides that "When recklessness establishes an element of the offense, if the actor, due to self-induced intoxication, is unaware of a risk of which he would have been aware had he been sober, such unawareness is immaterial." See also State v. Cameron, 104 N.J. 42 (1986).
Nevertheless, the defendant argues that the court incorrectly instructed the jury that it had to find that the defendant's intoxication was "so severe as to result in a prostration of mental faculties." The court advised the jury:
If you find that at the time the defendant is alleged to have committed the offenses he was so overcome by the ingestion of alcohol that he was unable to act with purpose, that he was unable to act with knowledge, then you cannot find the defendant guilty of those offenses where purpose or knowledge are required.
However, if you find that even though he was under the influence of alcohol he was still able to act with purpose or to act with knowledge, then intoxication will not be a defense to those crimes.
The influence of alcohol must be such as to eliminate the element of purpose and/or knowledge.
Whether such is the case is for you to decide.
The court continued:
Now, it is very important that you discriminate between the state of mind in which the individual is clearly excited or depressed or feels uninhibited, feels bold or feels fearless or the like by intoxicating liquor and yet is still capable of performing the specific mental acts, and that mental condition where the alcohol has so prostrated the person's faculties as to make him incapable of performing such mental acts.
Now, it is only with the latter that the defense of intoxication is available.
In State v. Stasio, supra, 78 N.J. at 488, Justice Handler, in his concurring opinion, stated:
The fear of condoning criminals, who are also drunks, can be addressed, I respectfully suggest, by imposing a heavy burden of proof upon defendants to show a degree of intoxication capable of prostrating the senses. Drunkenness which does not have this effect does not diminish responsibility and should not serve to excuse criminality.
In State v. Cameron, supra, our Supreme Court has recently emphasized that "prostration of faculties" is a prerequisite to presentation of the intoxication issue to the jury. 104 N.J. at 53-56. Given Cameron, it is now clear that the judge's charge *439 properly instructed the jury regarding the requisite condition before voluntary intoxication can be found to affect the mental state of purposeful or knowing conduct. See State v. Cameron, supra, 104 N.J. at 50-53. See also State v. Merlino, 208 N.J. Super. 147, 151 (App.Div. 1985), certif. den., 103 N.J. 460 (1986).
Taking the charge as a whole, see State v. Wilbely, 63 N.J. 420, 422 (1973), we find no reversible error in the charge and certainly cannot conclude that there was "plain error." R. 2:10-2. Experienced defense counsel, who made no relevant requests for instructions, stated to the court immediately after the instructions that he found them "[a] good charge. No objections."

III
Defendant argues that the sentencing judge misapplied N.J.S.A. 2C:11-3b due to a misconception that the statute required him to sentence the defendant to a minimum of 30 years without parole eligibility. Defendant asserts that, in fact, there was no such minimum term required since the statute at the time of this offense provided

Murder is a crime of the first degree but a person convicted of murder may be sentenced, except as provided in subsection c. of this section, by the court to a term of 30 years, during which the person shall not be eligible for parole or to a specific term of years which shall be between 30 years and life imprisonment of which the person shall serve 30 years before being eligible for parole. [Emphasis added.]
Defendant argues that the court could have sentenced him as a first degree offender to a term of between 10 and 20 years. See N.J.S.A. 2C:43-6a(1). However, defendant's position ignores the legislative history.
Prior to August 6, 1982, the sentence for murder, although a crime of the first degree, was for a term of 30 years with 15 years to be served before parole eligibility or "as in a crime of the first degree except that the maximum term for such a crime of the first degree shall be 30 years." N.J.S.A. 2C:11-3b. Moreover, prior to August 6, 1982 the court could automatically *440 impose a sentence for murder of between 30 years and life imprisonment, with up to one-half of the term or 25 years on a life sentence, to be served before parole eligibility. See N.J.S.A. 2C:43-7a(1) deleted by L. 1982, c. 111 § 2; N.J.S.A. 2C:43-7b; State v. Maguire, 84 N.J. 508 (1980). The Legislature's adoption of the death penalty statute in 1982, L. 1982, c. 111, § 1, cannot be understood to reduce the authorized maximum in murder cases where the death penalty was not imposed. Nor could the 1982 amendment be understood to have permitted a sentence of 10 to 20 years without even the ability to impose the previously authorized maximum of 10 to 30 years.
In State v. Biegenwald, 96 N.J. 630, 635, opinion clarified, 97 N.J. 666 (1984), the Supreme Court noted the authorized sentences for murder as of the date of this offense in 1983:
As a result of the Code amendments establishing death as a possible penalty for murder (effective August 6, 1982), there are now three sentencing options: (1) death; (2) a sentence of thirty years without parole; (3) a sentence between thirty years and life, with a mandatory minimum thirty year term of parole ineligibility. N.J.S.A. 2C:11-3b.
See also State v. Johnson, 206 N.J. Super. 341, 344 (App.Div. 1985). Moreover, as stated in State v. Rodriguez, 97 N.J. 263, 274 n. 4 (1984):
[N.J.S.A. 2C:11-3b] was amended, effective August 6, 1982, to set forth a minimum sentence of thirty years without parole eligibility for murder. [emphasis in original].
Finally, we note that the word "may" in N.J.S.A. 2C:11-3b was amended to "shall" by L. 1985, c. 178, § 2, thus evidencing legislative intent to have a mandatory minimum sentence of 30 years, with 30 years to be served without parole eligibility, upon conviction for murder.[6] We view this amendment as a clarification of the 1982 amendment given the legislative history *441 surrounding that legislation. Cf. State v. Hodge, 95 N.J. 369, 374 (1984).

IV
At oral argument defendant abandoned his contention concerning the jury selection process in light of Lockhart v. McCree, 476 U.S. ___, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986) and State v. Cohen, 211 N.J. Super. 544 (App.Div. 1986). Those cases, upholding the death qualification process in a capital case, however, presumed that juries would be selected without improper excuse of jurors who could perform their duty notwithstanding objections to capital punishment. See Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). We are willing to accept for purposes of this appeal defendant's abandonment of the contention that a juror was improperly excused (and that a "conviction prone" jury resulted) because of prior New Jersey authority modifying the death penalty to life imprisonment where a possible violation of Witherspoon was involved. See Funicello v. New Jersey, 403 U.S. 948, 91 S.Ct. 2278, 29 L.Ed.2d 859 (1971), where the United States Supreme Court granted certiorari, summarily reversed and remanded the case "to the Supreme Court of New Jersey for further proceedings," citing Witherspoon and its progeny as well as United States v. Jackson, 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968). See also State v. Funicello, 60 N.J. 60 (1972), cert. den., 408 U.S. 942, 92 S.Ct. 2849, 33 L.Ed.2d 766 (1972), in which our Supreme Court subsequently set aside the death penalty and sentenced defendants "to life imprisonment", 60 N.J. at 67, and further stated that "[n]o such order shall delay or affect any appeal with respect to guilt." 60 N.J. at 68.

V
We find that defendant's other arguments including the 23 points raised in his pro se brief are clearly without merit and do not warrant extended discussion. R. 2:11-3(e)(2).
*442 Accordingly, the judgment of conviction and the sentences imposed are affirmed.
NOTES
[1] The Code makes a major distinction between acting "purposely" or "knowingly" on the one hand, and acting "recklessly" on the other. See N.J.S.A. 2C:2-2b. See also II Final Report of the New Jersey Criminal Law Revision Comm'n, 41-44 (1971). Aggravated manslaughter and manslaughter constitute homicide involving different degrees of reckless conduct. See N.J.S.A. 2C:11-4. See also N.J.S.A. 2C:2-3b and c regarding required causal relationship between conduct and result.
[2] The jury was expressly charged as to the meaning of acting "recklessly" and on the lesser included offenses of aggravated manslaughter and manslaughter. As a result of a question from the jury apparently directed to the distinction between murder and reckless homicide the court re-charged the jury on the distinction.

at specific persons known to him with the object in his mind that he wants to cause them serious bodily injury, then that is knowing or purposeful murder.
Here there are issues that I perceive that are presented to the trier of fact, and that is the jury.
[3] As a prerequisite to capital punishment under our statute, the defendant must purposely or knowingly cause death or serious bodily injury resulting in death "by his own conduct" or procure same, N.J.S.A. 2C:11-3c, and not merely participate as an accomplice in a felony murder. As a matter of federal constitutional law, however, a defendant may be put to death for felony murder only if he kills, attempts or intends to kill or employs the lethal force. Such a finding must be made irrespective of the requirement of the statute, but the absence of such a statutory requirement does not render the statute unconstitutional. See Cabana v. Bullock, 474 U.S. ___, 106 S.Ct. 689, 88 L.Ed.2d 704 (1986).
[4] As N.J.S.A. 2C:2-8d is not involved in this case, we need not consider the impact of the amendment which took effect after the date of the offense.
[5] This very issue was recently reserved by the Supreme Court in State v. Cameron, 104 N.J. 42, 58 (1986).
[6] The word "may" is again found in L. 1985, c. 478, § 1, because the amendments therein apparently omitted inclusion of the prior 1985 amendments. However, L. 1985, c. 478, § 1 does not contain an indication that the Legislature intended to amend "shall" back to "may." See also "Appendix I-Reconciliation of Conflicts," 1986 Session Law Service, No. 3, A-2 to A-6.